## BURFORD ET AL. *v.* SUN OIL CO. ET AL.[*]

No. 495. Argued February 8, 9, 1943. Reargued April 14, 15, 1943.—Decided May 24, 1943.

---

[*] Together with No. 496, *Sun Oil Co. et al.* v. *Burford et al.,* also on writ of certiorari, 317 U. S. 623, to the Circuit Court of Appeals for the Fifth Circuit.

*Messrs. James P. Hart* and *Ed Roy Simmons,* Assistant Attorney General of Texas, with whom *Mr. Gerald C. Mann,* Attorney General, was on the brief, for petitioners in No. 495 and respondents in No. 496.

*Mr. J. A. Rauhut* argued the cause on the original argument for the Sun Oil Co. and on the reargument for the Sun Oil Co. et al.; *Mr. J. B. Robertson* argued the cause on the original argument for the Magnolia Petroleum Co., and was on the briefs with *Mr. Rauhut* for respondents in No. 495 and petitioners in No. 496.

MR. JUSTICE BLACK delivered the opinion of the Court.

In this proceeding brought in a federal district court, the Sun Oil Co. attacked the validity of an order of the

Texas Railroad Commission granting the petitioner Burford a permit to drill four wells on a small plot of land in the East Texas oil field.[1] Jurisdiction of the federal court was invoked because of the diversity of citizenship of the parties, and because of the Companies' contention that the order denied them due process of law. There is some argument that the action is an "appeal" from the State Commission to the federal court, since an appeal to a state court can be taken under relevant Texas statutes;[2] but of course the Texas legislature may not make a federal district court, a court of original jurisdiction, into an appellate tribunal or otherwise expand its jurisdiction,[3] and the Circuit Court of Appeals in its decision correctly viewed this as a simple proceeding in equity to enjoin the enforcement of the Commission's order.

Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion, whether its jurisdiction is invoked on the ground of di-

[1] The Magnolia Petroleum Co. was permitted to intervene with a similar complaint against the validity of the order. The parties defendant include Burford; Burford's assignee, the X Y Z Oil and Gas Co.; and the Commission. Hereafter the original plaintiffs will be referred to as the Companies and the defendants will be referred to as Burford or as the Commission. The case is here on a petition for certiorari by the Commission and on a cross-petition for certiorari by the Companies.

[2] For a description of the nature of the so-called "appeal," see *Stanolind Oil & Gas Co.* v. *Midas Oil Co.*, 123 S. W. 2d 911, 913; *Gulf Land Co.* v. *Atlantic Refining Co.*, 134 Texas 59, 73, 131 S. W. 2d 73.

[3] See the discussion in the opinion below, 130 F. 2d 10, 17; cf. *Tennessee Coal Co.* v. *George*, 233 U. S. 354, 359, 360 and *Texas Pipe Line* v. *Ware*, 15 F. 2d 171. A statute similar to that involved in the instant case, which permits suit in any competent court of Travis County, Texas, has been construed to be an expression by the State of willingness to allow these proceedings to be brought in a federal court, *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 392. Since federal equity jurisdiction depends on federal statutes, the Texas statutory provision has little meaning as applied to such cases.

versity of citizenship or otherwise, "refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest";[4] for it "is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy."[5] While many other questions are argued, we find it necessary to decide only one: Assuming that the federal district court had jurisdiction, should it, as a matter of sound equitable discretion, have declined to exercise that jurisdiction here?

The order under consideration is part of the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of "as thorny a problem as has challenged the ingenuity and wisdom of legislatures." *Railroad Commission* v. *Rowan & Nichols Oil Co.,* 310 U. S. 573, 579. The East Texas field, in which the Burford tract is located, is one of the largest in the United States. It is approximately forty miles long and between five and nine miles wide, and over 26,000 wells have been drilled in it.[6] Oil exists in the pores and crevices of rocks and sand and moves through these channels. A large area of this sort is called a pool or reservoir and the East

---

[4] *United States* v. *Dern,* 289 U. S. 352, 360.

[5] *Pennsylvania* v. *Williams,* 294 U. S. 176, 185. "Reluctance there has been to use the process of federal courts in restraint of state officials though the rights asserted by the complainants are strictly federal in origin. . . . There must be reluctance even greater when the rights are strictly local, jurisdiction having no other basis than the accidents of residence." *Hawks* v. *Hamill,* 288 U. S. 52, 61.

[6] For a description of the East Texas field see *Railroad Commission* v. *Rowan & Nichols Oil Co.,* 311 U. S. 570, 574; Tucker, Today's East Texas Problems Analyzed in Survey of Field, Oil and Gas Journal, April 1, 1937, p. 10; Weber, East Texas As It Is Today, Oil and Gas Journal, April 27, 1939, p. 12. The latter article includes a map of the area showing various developments in the field. For a simple outline map, see 1941 Annual Report, Oil & Gas Division, Texas Railroad Commission, p. 34.

Texas field is a giant pool. The chief forces causing oil to move are gas and water, and it is essential that the pressures be maintained at a level which will force the oil through wells to the surface. As the gas pressure is dissipated, it becomes necessary to put the well "on the pump" at great expense;[7] and the sooner the gas from a field is exhausted, the more oil is irretrievably lost. Since the oil moves through the entire field, one operator can not only draw the oil from under his own surface area, but can also, if he is advantageously located, drain oil from the most distant parts of the reservoir. The practice of attempting to drain oil from under the surface holdings of others leads to offset wells and other wasteful practices; and this problem is increased by the fact that the surface rights are split up into many small tracts.[8] There are approximately nine hundred operators in the East Texas field alone.

For these and many other reasons based on geologic realities, each oil and gas field must be regulated as a unit for conservation purposes. Compare *Railroad Commission* v. *Rowan & Nichols Co.,* 311 U. S. 570, 574. The federal government, for the present at least, has chosen to leave the principal regulatory responsibility with the States, but does supplement state control.[9] While there is no question of the constitutional power of the State to take appropriate action to protect the industry and pro-

---

[7] Geological factors making for the necessity of pumping are described in Ely, The Conservation of Oil, 51 Harv. L. Rev. 1209, 1220. The relation of natural gas to oil production is described in Miller, Function of Natural Gas in the Production of Oil.

[8] Wells in the East Texas field considered unnecessary from the engineering standpoint are said to have cost $160,000,000. For a discussion of this superfluous well problem, see Ely, The Conservation of Oil, *supra,* 1232. In 1941 there were 910 operators in the East Texas field. 1941 Railroad Commission Report, *supra,* 208.

[9] 15 U. S. C. § 715, *Panama Refining Co.* v. *Ryan,* 293 U. S. 388; note 12, *infra.*

tect the public interest, *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190; *Champlin Refining Co.* v. *Commission,* 286 U. S. 210, the state's attempts to control the flow of oil and at the same time protect the interest of the many operators have from time to time been entangled in geological-legal problems of novel nature.

Texas' interests in this matter are more than that very large one of conserving gas and oil, two of our most important natural resources.   It must also weigh the impact of the industry on the whole economy of the State and must consider its revenue, much of which is drawn from taxes on the industry and from mineral lands preserved for the benefit of its educational and eleemosynary institutions.[10]   To prevent "past, present, and imminent evils" in the production of natural gas, a statute was enacted "for the protection of public and private interests against such evils by prohibiting waste and compelling ratable production."   The primary task of attempting adjustment of these diverse interests is delegated to the Railroad Commission, which Texas has vested with "broad discretion" in administering the law.[11]

The Commission, in coöperation with other oil producing States, has accepted state oil production quotas and has undertaken to translate the amount to be produced for the State as a whole into a specific amount for each field and for each well.[12]   These judgments are made with due re-

---

[10] The problem of gaining an adequate revenue from the petroleum industry was particularly serious in Texas during the period 1930–35. The question was discussed by Governor Sterling in messages to the legislature in 1931, 1932, and 1933, and by Governor Allred in 1935. See The Texas Senate Journal, Jan. 13–May 23, 1931, p. 526; *ibid.,* July–August, 1931, p. 594; *ibid.,* September–October, 1931, p. 164; *ibid.,* August–September, 1932, p. 60; *ibid.,* Reg. Sess., 1933, pp. 20, 24; *ibid.,* Reg. Sess., 1935, pp. 587, 589–90.

[11] Vernon's Texas Stat. (1936), Art. 6008, §§ 1, 22.

[12] For description of the methods of regulation of the oil industry, see Marshall and Meyers, Legal Planning of Petroleum Production,

gard for the factors of full utilization of the oil supply, market demand, and protection of the individual operators, as well as protection of the public interest. As an essential aspect of the control program, the State also regulates the spacing of wells. The legislature has disavowed a purpose of requiring that "the separately owned properties in any pool [should] be unitized under one management, control or ownership" [13] and the Commission

41 Yale L. Jour. 33; Marshall and Meyers, Legal Planning of Petroleum Production: Two Years of Proration, 42 Yale L. Jour. 702; Ely, The Conservation of Oil, 51 Harv. L. Rev. 1209; Hardwicke, Legal History of Conservation of Oil in Texas, in The American Bar Association's publication, Legal History of Conservation of Oil and Gas, 214; Walker, The Problem of the Small Tract Under Spacing Regulations, 17 Tex. L. Rev. (Appendix) 157; Summers, Oil Production Regulation—Due Process, 19 Texas L. Rev. 1; Davis, Judicial Emasculation of Administrative Action, 19 Tex. L. Rev. 29. The Interstate Oil Compact Commission is described in its own publication, The Interstate Compact to Conserve Oil and Gas (1942), published over the signature of Governor Phillips of Oklahoma. Federal wartime regulations concerning the drilling of wells have been issued by the Petroleum Administration for War. See Conservation Order M-68 as amended, 8 Fed. Reg. 3955, discussed in 10 George Washington L. Rev. 926.

The Commission has described its own regulatory program as follows:

"The Railroad Commission of Texas carries out its functions of production control or proration by an elaborate system of orders, schedules, and reports. In order to keep the production of oil for the State during any period within the limits of a predetermined figure, the Commission sets by order the maximum allowable production for the State. This total allowable is then distributed among the various fields, and the allowable for each field in turn is allocated among the component properties so that the Commission, under this process, fixes the daily allowable for each well during the effective period of each allowable order. After these calculations have been made, a schedule of these allowables is prepared, printed, and mailed to each operator so that he may know how much oil may be produced from each of his leases during the month." 1939 Annual Report of the Oil and Gas Division, Texas Railroad Commission, p. 9.

[13] Vernon's Texas Stat. (1936), Art. 6014–g.

must thus work out the difficult spacing problem with due regard for whatever rights Texas recognizes in the separate owners to a share of the common reservoir. At the same time it must restrain waste, whether by excessive production or by the unwise dissipation of the gas and other geologic factors that cause the oil to flow.

Since 1919 the Commission has attempted to solve this problem by its Rule 37. The rule provides for certain minimum spacing between wells, but also allows exceptions where necessary "to prevent waste or to prevent the confiscation of property." The prevention of confiscation is based on the premises that, insofar as these privileges are compatible with the prevention of waste and the achievement of conservation, each surface owner should be permitted to withdraw the oil under his surface area, and that no one else can fairly be permitted to drain his oil away. Hence the Commission may protect his interest either by adjusting his amount of production upward, or by permitting him to drill additional wells. "By this method each person will be entitled to recover a quantity of oil and gas substantially equivalent in amount to the recoverable oil and gas under his land." [14]

Additional wells may be required to prevent waste as has been noticed, where geologic circumstances require immediate drilling: "The term 'waste,' as used in oil and gas Rule 37, undoubtedly means the ultimate loss of oil. If a substantial amount of oil will be saved by the drilling of a well that otherwise would ultimately be lost, the permit to drill such well may be justified under one of the exceptions provided in Rule 37 to prevent waste." *Gulf Land*

---

[14] *Brown* v. *Humble Oil Co.*, 126 Tex. 296, 312, 83 S. W. 2d 935, 87 S. W. 2d 1069. This principle is a limitation upon the so-called "Rule of Capture" under which the surface owner is entitled not only to the amount of oil under his land but to all other oil which he can drain from under his neighbor's land to his own. The rule of capture is discussed by Ely, *supra,* note 12, at 1218.

*Co.* v. *Atlantic Refining Co.*, 134 Tex. 59, 70, 131 S. W. 2d 73.

The delusive simplicity with which these principles of exception to Rule 37 can be stated should not obscure the actual non-legal complexities involved in their application.[15] While the surface holder may, subject to qualifications noted, be entitled under current Texas law to the oil under his land, there can be no absolute certainty as to how much oil actually is present, *Railroad Commission* v. *Rowan & Nichols Co.*, 311 U. S. 570, 576, and since the waste and confiscation problems are as a matter of physical necessity so closely interrelated, decision of one of the questions necessarily involves recognition of the other.[16]

---

[15] "We believe it would be impossible for the Legislature to lay down a definite standard by which it could be determined correctly just when and under what conditions an oil producing area should be divided into drilling units and what size and shape the units should be. . . . In performing its functions as a fact-finding body, the Corporation Commission is empowered . . . to take evidence upon all these subjects and others found by scientific investigation and research to have a bearing upon securing the greatest possible recovery from the common source of supply, and by application of the principles of physics, chemistry, geology, and mathematics, can determine by certain calculations at what intervals of space wells should be located in order to bring about such recovery and thus prevent waste and also protect the correlative rights of all the owners of interests therein." *Patterson* v. *Stanolind Oil & Gas Co.*, 182 Okla. 155, 161, 162, 77 P. 2d 83.

[16] In *Danciger Oil & Refining Co.* v. *Railroad Commission*, 49 S. W. 2d 837, 842, the court describes the geological phenomena which are the basis of the rules of law dealing with leaseholders who, through full utilization of their own tracts, might cause waste for others, and continues: "No particular lease or well can therefore be taken as a unit, but must be considered in its relation to adjacent leases or wells, with a view to conserving the whole, and is subject to regulation accordingly."

The well spacing program and the proration program can not be considered separately; "the two are a part of a single integrated system and must be considered together." Davis, note 12, *supra*, at 55. For

The sheer quantity of exception cases makes their disposition of great public importance. It is estimated that over two-thirds of the wells in the East Texas field exist as exceptions to the rule, and since each exception may provoke a conflict among the interested parties, the volume of litigation arising from the administration of the rule is considerable.[17] The instant case arises from just such an exception. It is not peculiar that the State should be represented here by its Attorney General, for cases like this, involving "confiscation," are not mere isolated disputes between private parties. Aside from the general principles which may evolve from these proceedings, the physical facts are such that an additional permit may affect pressure on a well miles away. The standards applied by the Commission in a given case necessarily affect the entire state conservation system. Of far more importance than any other private interest is the fact that the over-all plan of regulation, as well as each of its case by case manifestations, is of vital interest to the general public which must be assured that the speculative interests of individual tract owners will be put aside when necessary to prevent the irretrievable loss of oil in other parts of the field. The Commission in applying the statutory standards of course considers the Rule 37 cases as a part

a discussion of the interrelation of spacing and proration, see Ely, *supra,* note 12, at 1229. Because of the economic consequences of granting exceptions under Rule 37, the Commission must be given fair latitude to exercise "sound judgment and discretion." *Gulf Land Co.* v. *Atlantic Refining Co.,* 134 Tex. 59, 79, 131 S. W. 2d 73. And because of the difficulties of decision, the Commission must be allowed a "reasonable margin for error." *Railroad Commission* v. *Shell Oil Co.,* 139 Tex. 66, 75, 161 S. W. 2d 1022.

[17] The Commission dealt with approximately sixty Rule 37 cases, including this one, in one or another court in 1941. Annual Report of the Railroad Commission of Texas, 1941, pp. 15–26. Ely, *supra,* note 12, 1230, estimates that 17,000 wells in the East Texas field are operated under exception permits.

of the entire conservation program with implications to the whole economy of the State.[18]

With full knowledge of the importance of the decisions of the Railroad Commission both to the State and to the oil operators, the Texas legislature has established a system of thorough judicial review by its own state courts. The Commission orders may be appealed to a state district court in Travis County, and are reviewed by a branch of the Court of Civil Appeals and by the State Supreme Court.[19] While the constitutional power of the Commission to enforce Rule 37 or to make exceptions to it is seldom seriously challenged, *Brown* v. *Humble Oil Co.*, 126 Tex. 296, 307, 83 S. W. 2d 935, 87 S. W. 2d 1069, the validity of particular orders from the standpoint of statutory interpretation may present a serious problem, and a substantial number of such cases have been disposed of by the Texas courts which alone have the power to give definite answers to the questions of state law posed in these proceedings.

In describing the relation of the Texas court to the Commission, no useful purpose will be served by attempting to label the court's position as legislative, *Prentis* v. *Atlantic Coast Line*, 211 U. S. 210; *Keller* v. *Potomac Electric Co.*, 261 U. S. 428, or judicial, *Bacon* v. *Rutland R. Co.*, 232

---

[18] "The Commission is charged generally with the conservation of oil and gas in their production, storage, transportation. . . . The Commission must make rules, regulations, and orders to accomplish conservation of oil and gas. . . . One of the things that the Commission must do to conserve oil and gas is to see that oil and gas fields are drilled in an orderly and scientific manner. In order to accomplish orderly drilling, the Commission has simply promulgated a rule fixing minimum spacing distances at which wells may be drilled without application, notice, or hearing. Anyone desiring to drill a well at a lesser distance must secure a special permit, after notice and hearing." *Gulf Land Co.* v. *Atlantic Refining Co.*, 134 Tex. 59, 69, 131 S. W. 2d 73.

[19] Vernon's Texas Stat. (1936), Art. 6049c, § 8.

U. S. 134—suffice it to say that the Texas courts are working partners with the Railroad Commission in the business of creating a regulatory system for the oil industry. The Commission is charged with principal responsibility for fact finding and for policy making and the courts expressly disclaim the administrative responsibility, *Gulf Land Co.* v. *Atlantic Refining Co.*, 134 Tex. 59, 131 S. W. 2d 73, but on the other hand, the orders of the Commission are tested for "reasonableness" by trial de novo before the court, *Railroad Commission* v. *Shell Oil Co.*, 139 Tex. 66, 76–80, 161 S. W. 2d 1022, and the court may on occasion make a careful analysis of all the facts of the case in reversing a Commission order. *Railroad Commission* v. *Gulf Production Co.*, 134 Tex. 122, 132 S. W. 2d 254. The court has fully as much power as the Commission to determine particular cases, since after trial de novo it can either restrain the leaseholder from proceeding to drill, or, if the case is appropriate, can restrain the Commission from interfering with the leaseholder. The court may even formulate new standards for the Commission's administrative practice and suggest that the Commission adopt them. Thus, in the *Shell Oil* case, *supra*, at 73, the court took the responsibility of "laying down some standard to guide the Commission in the exercise of its discretion" in Rule 37 cases; and in *Brown* v. *Humble Oil Co.*, *supra*, 312, the court explicitly suggested a revision in Rule 37.

To prevent the confusion of multiple review of the same general issues, the legislature provided for concentration of all direct review of the Commission's orders in the state district courts of Travis County. The Texas courts have authoritatively declared the purpose of this restriction: "If an order of the commission, lawful on its face, can be collaterally attacked in the various courts and counties of the state on grounds such as those urged in the instant case, interminable confusion would result." *Texas Steel Co.* v. *Fort Worth & D. C. Ry. Co.*, 120 Tex. 597, 604, 40

S. W. 2d 78. To permit various state courts to pass upon the Commission's rules and orders, "would lead to intolerable confusion. If all district courts of this State had jurisdiction of such matters, different courts of equal dignity might reach different and conflicting conclusions as to the same rule. Manifestly, the jurisdictional provision under discussion was incorporated in the act for the express purpose of avoiding such confusion." *Alpha Petroleum Co.* v. *Terrell*, 122 Tex. 257, 273, 59 S. W. 2d 364, 372. Time and experience, say the Texas courts, have shown the wisdom of this rule.[20] Concentration of judicial supervision of Railroad Commission orders permits the state courts, like the Railroad Commission itself, to acquire a specialized knowledge which is useful in shaping the policy of regulation of the ever-changing demands in this field. At the present time, less than ten per cent of these cases come before the federal district court.[21]

The very "confusion" which the Texas legislature and Supreme Court feared might result from review by many state courts of the Railroad Commission's orders has resulted from the exercise of federal equity jurisdiction. As a practical matter, the federal courts can make small contribution to the well organized system of regulation and review which the Texas statutes provide. Texas courts can give fully as great relief, including temporary restraining orders, as the federal courts. Delay, misunderstanding of local law, and needless federal conflict with the state policy, are the inevitable product of this double system of review. The most striking example of misunderstanding has come where the federal court has flatly disagreed with the position later taken by a state court as to state law. See *MacMillan* v. *Railroad Commission,*

---

[20] *West Texas Compress Co.* v. *Panhandle & S. F. Ry. Co.*, 15 S. W. 2d 558, 561.

[21] Summary of Litigation, Annual Report of the Oil and Gas Division, Railroad Commission of Texas, 1941, 15 *et seq.*

51 F. 2d 400, 287 U. S. 576, and *Danciger Oil & Refining Co. v. Railroad Commission,* 49 S. W. 2d 837; 122 Tex. 243, 56 S. W. 2d 1075. In those cases, the federal court attributed a given meaning to the state statute which went to the heart of the control program. The Court of Civil Appeals disagreed, but before ultimate review could be had either in Texas or here, the legislature amended its statutes so that the cases became moot. Had the Texas Civil Appeals decision come first, it would have been unnecessary to make the changes which were made in an effort to stay within the limit thought by the Governor of Texas to have been set by the tone of the federal court's opinion.[22] The Texas legislature later changed the law back to its original state, as clear an example of waste motion as can be imagined.[23] The federal court has been called upon constantly to determine whether the Railroad Commission has acted within the scope of statutory authority, while the important constitutional issues have, as the federal court has repeatedly said, been fairly well settled from the beginning.[24]

---

[22] In his message of August 3, 1931, to the Texas legislature, concerning the *MacMillan* decision, Governor Sterling said: "At the time the opinion was written, the court, knowing that the Legislature was in session, it may reasonably be assumed that if the court had thought the laws were invalid, would have held so as to give this Legislature an opportunity to eliminate and correct any cause for invalidity. The court having failed to do this, we are justified in assuming that our existing conservation laws are valid. . . . It appeals to me, in view of this decision of the United States Court, that it would be unwise to attempt radical changes in our existing laws. Any attempt at their amendment or modification should retain their general structure and ideas, and not inject changes that would invite any new attacks upon them." Texas Senate Journal, July-August, 1931, p. 594.

[23] Hardwicke, *supra,* note 12, 230–239.

[24] In 1936, in an action to restrain the enforcement by the State Commission of an order limiting the production of gas, the federal court said: "This controversy has been long drawn out. In varying

These federal court decisions on state law have created a constant task for the Texas Governor, the Texas legislature, and the Railroad Commission. The Governor of Texas, as has been noted above, felt called upon to forge his oil program in the light of the remotest inferences of federal court opinions. In one instance he thought it necessary to declare martial law.[25] Special sessions of the legislature have been occupied with consideration of federal court decisions.[26] Legislation passed under the cir-

forms, under different statutes, but always to the same purport and effect as to these complainants, order after order has been drawn, enjoined, and drawn again. This is the fifth time this court has written. Texoma Natural Gas Co. *v.* Railroad Commission, 59 F. 2d 750; Texoma Natural Gas Co. *v.* Terrell, 2 F. Supp. 168; Canadian River Gas Co. *v.* Terrell, 4 F. Supp. 222; Texas Panhandle Gas Co. *v.* Thompson, 12 F. Supp. 462." *Consolidated Gas Utilities Corp.* v. *Thompson,* 14 F. Supp. 318, 328.

In summarizing litigation prior to 1934, the federal court said: "In not a single one of these cases did we find the statute unreasonable or invalid. In not a single one did we find the orders invalid because, though complying with the statute, they violated the Constitution. In each of the cases in which injunctions issued we made it clear it was because we thought the orders had been entered in the teeth of statutes forbidding the commission's doing what it attempted to do." *Amazon Petroleum Corp.* v. *Railroad Commission,* 5 F. Supp. 633, 635.

For a survey of litigious history of the East Texas field, see Hardwicke and Davis, note 12, *supra.*

[25] For a discussion of the martial law interlude, see *Sterling* v. *Constantin,* 287 U. S. 378; Hardwicke, *supra,* note 12, 233–236.

[26] The special session of July and August, 1931, was in session when *MacMillan* v. *Railroad Commission* was decided, and, as has been noted above, the *MacMillan* case provided the special session with the bulk of its business. *Peoples' Petroleum Producers* v. *Smith,* 1 F. Supp. 361, was the cause of the special session of November, 1932. In his introductory message to the special session, Governor Sterling said: "Most assuredly, I would not, at this time, have called you into extraordinary session except I believe a grave crisis again confronts the State and our people, on account of the federal court having held that the Railroad Commission has gone beyond the authority given in this statute enacted

cumstances of the strain and doubt created by these decisions was necessarily unsatisfactory.[27]   The Railroad Commission has had to adjust itself to the permutations of the law as seen by the federal courts.   The most recent example was in connection with the *Rowan & Nichols* case, in which the Commission felt compelled to adopt a new proration scheme to comply with the demands of a federal court decision which was reversed when it came to this Court.   311 U. S. 570, 572.

---

at that time in promulgating their orders as to proration and conservation of oil and gas. . . . It is apparent that [as a result of the decision] the state's greatest natural resource—oil and gas—will be wasted and destroyed, resulting in a tremendous financial injury to the State, especially to the taxpayers and the public schools. It is apparent to me that under such conditions, the state's income, as a result of the gross production tax on oil, will be reduced from approximately $16,000 a day to a few thousand dollars per day, thus depriving the State of a tremendous amount of revenue." Texas Senate Journal, Nov. 1932, pp. 3, 4.

[27] Consider for example the plight of the state authorities during the period in which the federal court found it necessary to reject the Commission's expert testimony on a basic matter of policy as "largely theory and speculation" in the *MacMillan* case, *supra,* similar testimony was accepted by the state court in the *Danciger* case, *supra,* and like testimony was in turn accepted by the federal court in *Amazon Petroleum Corp.* v. *Railroad Commission,* 5 F. Supp. 633.

Governor Allred in his message of Jan. 16, 1935, recommended to the legislature that it revise the conservation laws generally. He said, "Much of the trouble of the oil industry and the official life charged with its regulation has been due to misunderstandings, misinformation, and ill-considered criticism by those either unfamiliar or unconcerned with the magnitude or proper solution of its problems or the practical difficulties confronting our public officials in this new and unexplored field of regulation. In the past, not a little of our difficulties has been due to the fact that laws dealing with the production of oil and gas, as well as the rules and regulations of the conservation commission passed thereunder, have been enacted under high pressure at a time when, figuratively speaking, the 'House was on fire.' " Texas Sen. Journal, Reg. Sess. 1935, 84, 89.

As has been noted, the federal court cases have dealt primarily with the interpretation of state law, some of it state law fairly remote from oil and gas problems. The instant case raised a number of problems of no general significance on which a federal court can only try to ascertain state law.[28] For example, we are asked to determine whether a previous Travis county district court decision makes this case res adjudicata and whether another case pending in Travis county deprived the Commission of jurisdiction to consider Burford's application. The existence of these problems throughout the oil regulatory field creates a further possibility of serious delay which can injure the conservation program, for under our decision in *Railroad Commission* v. *Pullman Co.*, 312 U. S. 496, it may be necessary to stay federal action pending authoritative determination of the difficult state questions.

The conflict between federal courts and Texas has lessened appreciably in recent years primarily as a result of the decisions in the *Rowan & Nichols* case. 310 U. S.

---

[28] The company presses upon us as significant in the determination of its rights the following four questions of state law:

(1) Burford's 2.33 acres were voluntarily subdivided from a larger portion and therefore the State Commission under the state law has no authority to permit an exception to prevent confiscation.

(2) "As a matter of state law, under the undisputed evidence, the judgment . . . is res adjudicata."

(3) The pendency of a related cause in the state courts, "under the law of the State . . . deprived the Railroad Commission pendente lite of jurisdiction."

(4) "The granting of four locations [was] without authority in the state law" and was arbitrary.

To determine the validity of these assertions, presenting obviously difficult problems of state law, we are asked by the company to analyze at least fifty Texas decisions. If the federal court misinterprets only one of these decisions, we shall have provoked a needless conflict with the Texas courts.

573; 311 U. S. 614; 311 U. S. 570. In those cases we assumed that the principal issue in the review of Railroad Commission orders was whether the Commission had confined itself within the boundaries of due process of law, and held that any special relief provided by state statutes must be pursued in a state court. It is now argued that under the decision of the Texas Supreme Court in *Railroad Commission* v. *Shell Oil Co.*, 139 Tex. 66, 161 S. W. 2d 1022, the courts, whether federal or state, are required to review the Commission's order not for constitutional validity, but for compliance with a standard of "reasonableness" under the state statute which, it is said, is different from the constitutional standard of due process.

The whole cycle of federal-state conflict cannot be permitted to begin again by acceptance of this view. Insofar as we have discretion to do so, we should leave these problems of Texas law to the state court where each may be handled as "one more item in a continuous series of adjustments." *Rowan & Nichols, supra,* 310 U. S. at 584.

These questions of regulation of the industry by the state administrative agency, whether involving gas or oil prorationing programs or Rule 37 cases, so clearly involves basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them. "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, . . . These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion,' restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary . . . This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of

those powers." *Railroad Commission* v. *Pullman Co., supra,* 500, 501.[29]

The State provides a unified method for the formation of policy and determination of cases by the Commission

---

[29] Equity's discretion to decline to exercise its jurisdiction may be applied when judicial restraint seems required by considerations of general welfare. "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515, 552. It is particularly desirable to decline to exercise equity jurisdiction when the result is to permit a state court to have an opportunity to determine questions of state law which may prevent the necessity of decision on a constitutional question, *Chicago* v. *Fieldcrest Dairies,* 316 U. S. 168, 173. Equity relief may be withheld where the state remedy is adequate, *Atlas Life Ins. Co.* v. *W. I. Southern, Inc.,* 306 U. S. 563, or if a federal court is asked to review the proceedings of a federal agency by injunction, where an adequate statutory method of review has been provided, *Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41. In recent years, this Court has refused to permit the exercise of federal equity jurisdiction to enjoin the enforcement of state criminal statutes, *Beal* v. *Missouri Pacific R. Corp.,* 312 U. S. 45; *Watson* v. *Buck,* 313 U. S. 387; *Douglas* v. *Jeannette, ante,* p. 157. We have refused to permit injunctions to interfere with the collection of state taxes, *California* v. *Latimer,* 305 U. S. 255; *Kohn* v. *Central Distributing Co.,* 306 U. S. 531; and see 28 U. S. C. § 41. We have held that an equity court "may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest." *Securities & Exchange Comm'n* v. *United States Realty Co.,* 310 U. S. 434, 455; *American United Mutual Life Ins. Co.* v. *Avon Park,* 311 U. S. 138, 145. Equity in its discretion may decline to aid a utility which seeks to prevent a public service commission from making an investigation which is at least arguably within its power, *Petroleum Exploration* v. *Public Service Comm'n,* 304 U. S. 209; or a railroad which has an adequate form of state relief, *Illinois Commerce Comm'n* v. *Thomson,* 318 U. S. 675. Equity may impose terms and conditions upon the party at whose instance it proposes to act and "the power to impose such conditions is founded upon, and arises from, the discretion which the court has in such cases, to grant, or not to grant, the injunction applied for." *Inland Steel Co.* v. *United States,* 306 U. S. 153, 156.

and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here. Cf. *Matthews* v. *Rodgers,* 284 U. S. 521. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

The decision of the Circuit Court of appeals is reversed and the judgment of the District Court dismissing the complaint is affirmed for the reasons here stated.

*Reversed.*

MR. JUSTICE DOUGLAS, concurring:

I agree with the opinion of the Court and join in it. But there are observations in the dissenting opinion which impel me to add a few words. If the issues in this case were framed as the dissenting opinion frames them, I would agree that we should reach the merits and not direct a dismissal of the complaint. But the opinion of the Court as I read it does not hold or even fairly imply that "the enforcement of state rights created by state legislation and affecting state policies is limited to the state courts." Any such holding would result in a drastic inroad on diversity jurisdiction—a limitation which I agree might be desirable but which Congress, not this Court, should make. The holding in these cases, however, goes to no such length.

This decision is but an application of the principle expressed in *Pennsylvania* v. *Williams,* 294 U. S. 176, 185, that "federal courts of equity should exercise their discretionary power with proper regard for the rightful inde-

pendence of state governments in carrying out their domestic policy." That case, like the present one, was in the federal court by the diversity of citizenship route. It involved a receivership of an insolvent Pennsylvania corporation. Though the federal proceeding was first in time, this Court held that the federal court should stay its hand and turn over the assets of the corporation to the state administrative agency charged by state law with the responsibility of supervision and liquidation. In that case federal action would have preëmpted the field and excluded the assertion of state authority. In these cases the result of federal action would be potentially much more serious in terms of federal-state relations, as the opinion of the Court makes plain.

The Texas statute which governs suits to set aside these orders of the Railroad Commission has been construed by the Texas courts to give to the supervising courts a large measure of control over the administrative process. That control is much greater, for example, than the control exercised by federal Circuit Courts of Appeals over the orders of such agencies as the National Labor Relations Board. The opinion of the Court calls the Railroad Commission and the Texas courts "working partners." But as its review of Texas decisions shows, the courts may at times be the senior and dominant member of that partnership if they perform the functions which Texas law places on them. The courts do not sit merely to enforce rights based on orders of the state administrative agency. They sit in judgment on that agency. That, to me, is the crux of the matter. If the federal courts undertook to sit in review, so to speak, of this state administrative agency, they would in effect actively participate in the fashioning of the state's domestic policy. That interference would be a continuing one, as the opinion of the Court points out. Moreover, divided authority would result. Divided authority breeds friction—friction potentially more serious

than would have obtained in *Pennsylvania* v. *Williams,* if the administration of the affairs of that insolvent corporation had been left in the federal court to the exclusion of the state administrative agency.

MR. JUSTICE MURPHY joins in this opinion.

MR. JUSTICE FRANKFURTER, dissenting:

To deny a suitor access to a federal district court under the circumstances of this case is to disregard a duty enjoined by Congress and made manifest by the whole history of the jurisdiction of the United States courts based upon diversity of citizenship between parties. For I am assuming that law declared by this Court, in contradistinction to law declared by Congress, is something other than the manipulation of words to formulate a predetermined result. Judicial law to me implies at least some continuity of intellectual criteria and procedures in dealing with recurring problems.

I believe it to be wholly accurate to say that throughout our history it has never been questioned that a right created by state law and enforceable in the state courts can also be enforced in the federal courts where the parties to the controversy are citizens of different states. The reasons which led Congress to grant such jurisdiction to the federal courts are familiar. It was believed that, consciously or otherwise, the courts of a state may favor their own citizens. Bias against outsiders may become embedded in a judgment of a state court and yet not be sufficiently apparent to be made the basis of a federal claim. To avoid possible discriminations of this sort, so the theory goes, a citizen of a state other than that in which he is suing or being sued ought to be able to go into a wholly impartial tribunal, namely, the federal court sitting in that state. Thus, the basic premise of federal jurisdiction based upon diversity of the parties' citizenship is that the federal courts should afford remedies which are coextensive

with rights created by state law and enforceable in state courts.

That is the theory of diversity jurisdiction. Whether it is a sound theory, whether diversity jurisdiction is necessary or desirable in order to avoid possible unfairness by state courts, state judges and juries, against outsiders, whether the federal courts ought to be relieved of the burden of diversity litigation,—these are matters which are not my concern as a judge. They are the concern of those whose business it is to legislate, not mine. I speak as one who has long favored the entire abolition of diversity jurisdiction. See 13 Cornell L. Q. 499, 520 *et seq.* But I must decide this case as a judge and not as a legislative reformer.

Aside from the Johnson Act of May 14, 1934, 48 Stat. 775,[1] the many powerful and persistent legislative efforts to abolish or restrict diversity jurisdiction have ever since the Civil War been rejected by Congress. Again and again legislation designed to make inroads upon diversity jurisdiction has been proposed to Congress, and on each occasion Congress has deliberately refused to act. See, for example, the recent efforts to restrict diversity jurisdiction which were provoked by the *Black & White Taxicab* decision, 276 U. S. 518; Sen. Rep. No. 626, 70th Cong., 1st Sess.; Sen. Rep. No. 691, 71st Cong., 2d Sess.; Sen. Rep. No. 530 and Sen. Rep. No. 701, 72d Cong., 1st Sess. We

---

[1] The Johnson Act provides that no district court can enjoin the enforcement of any order issued by a state administrative body where the jurisdiction of the court "is based solely upon the ground of diversity of citizenship, or the repugnance of such order to the Constitution of the United States," and "where such order (1) affects rates chargeable by a public utility, (2) does not interfere with interstate commerce, and (3) has been made after reasonable notice and hearing, and where a plain, speedy, and efficient remedy may be had at law or in equity in the courts of such State."

Since the order under review in this case did not in any way affect rates chargeable by any public utility, the Johnson Act is inapplicable.

are dealing, then, not with a jurisdiction evolved and shaped by the courts but rather with one explicitly conferred and undeviatingly maintained by Congress.

The only limitations upon the exercise of diversity jurisdiction—apart from that which Congress made in the Johnson Act—are, broadly speaking, those illustrated by *Railroad Comm'n* v. *Rowan & Nichols Oil Co.*, 310 U. S. 573, as amended in 311 U. S. 614–15; *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496; and *Chicago* v. *Fieldcrest Dairies*, 316 U. S. 168. In *Rowan & Nichols* the claim based upon state law was derived from a statute requiring proration on a "reasonable basis," and it was not clear from the decisions of the state courts whether such courts might exercise an independent judgment as to what was "reasonable." 311 U. S. at 615. And in *Pullman* it was also "far from clear" whether state law, as authoritatively defined by the local courts, might not displace the federal questions raised by the bill. 312 U. S. at 499. Where the controlling state law is so undefined that a federal court attempting to apply such law would be groping utterly in the dark—where "no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination," *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. at 499—a court of equity may "avoid the waste of a tentative decision," *id.*, at 500. The *Pullman* and *Fieldcrest Dairies* cases are merely illustrative of one phase of the basic constitutional doctrine that substantial constitutional issues should be adjudicated only when no alternatives are open. A definitive ruling by the state courts upon the questions of construction of the state statutes might have terminated the controversies in those cases and thus eliminated serious constitutional questions. Under such circumstances it was an affirmation and not a denial of federal jurisdiction in each of those cases for the district court to hold the bill

pending a seasonable determination of the local issues in a proceeding to be brought in the state courts.

If, in a case of this sort, the state right sought to be enforced in the federal courts depended upon a "forecast rather than a determination" of state law, if the federal court was practically impotent to enforce state law because of its inability to fathom the complexities, legal or factual, of local law, the rule of *Rowan & Nichols* would be applicable. In such a situation the line of demarcation between what belongs to the state administrative body and what to its courts should not be drawn by the federal courts. If it could be shown that the circumstances of this case warranted the application of such a doctrine of abstention, I would gladly join in the decision of the Court. But such a showing has not been attempted, nor, I believe, could it be made.

Let us examine briefly the nature of the rights sought here to be enforced in the federal courts. In 1919 the Texas Railroad Commission issued its Rule 37 imposing general spacing limitations upon the drilling of oil wells, "provided that the Commission in order to prevent waste or to prevent the confiscation of property" would grant exceptions from the general restrictions. The order of the Railroad Commission in this case granted a permit to drill a well in exception to Rule 37. Section 8 of Article 6049c of Vernon's Texas Civil Statutes, 1925, provides that any "interested person affected by . . . any rule, regulation or order made or promulgated by the Commission thereunder, and who may be dissatisfied therewith, shall have the right to file a suit in a court of competent jurisdiction in Travis County, Texas, and not elsewhere, against the Commission, or the members thereof, as defendants, to test the validity of said laws, rules, regulations or orders."

Looking only at the statute, one could find at least two possible sources of ambiguity and confusion. By what

standards should the courts be governed in reviewing the "validity" of Commission orders? Does the statutory limitation of courts "of competent jurisdiction in Travis County, Texas," preclude review in the federal district court sitting in Travis County? Fortunately, we need no longer look only to the words of the statute. These questions are not new. They are not presented in this case for the first time. We are not writing on a clean slate.

It is true that Texas law governing review of Commission orders under Rule 37 has not always been clear and certain, and that there may be parts of the statute and some of the Railroad Commission's Rules, with which we are not now concerned, which, like other legal materials, are not as clear as they might be. But, in a series of recent decisions, the Supreme Court of Texas has not only given precision to the concepts of "waste" and "confiscation of property" employed in Rule 37, it has also defined with clarity the scope of judicial review of Commission action. In *Gulf Land Co.* v. *Atlantic Refining Co.*, 134 Tex. 59, 70–71, 131 S. W. 2d 73, the Court held that "the term 'confiscation' evidently has reference to depriving the owner or lessee of a fair chance to recover the oil and gas in or under his land, or their equivalents in kind. It is evident that the word refers principally to drainage. Under one of the exceptions in Rule 37, well permits may be granted to prevent 'confiscation.' It is the law that every owner or lessee of land is entitled to a fair chance to recover the oil and gas in or under his land, or their equivalents in kind. Any denial of such fair chance would be 'confiscation' within the meaning of Rule 37." And in *Railroad Commission* v. *Shell Oil Co.*, 139 Tex. 66, 80, 161 S. W. 2d 1022, decided by the Supreme Court of Texas on March 11, 1942, the scope of judicial review contemplated by Texas law was authoritatively defined: "In Texas, in all trials contesting the validity of an order,

rule, or regulation of an administrative agency, the trial is not for the purpose of determining whether the agency actually heard sufficient evidence to support its orders, but whether at the time such order was entered by the agency there then existed sufficient facts to justify the same. Whether the agency heard sufficient evidence is not material." See also *Cook Drilling Co.* v. *Gulf Oil Corp.*, 139 Tex. 80, 161 S. W. 2d 1035, decided the same day.

In other words, as the Circuit Court of Appeals has said in this case, "We now know the legal requisites of orders and regulations of the Railroad Commission under the conservation laws of Texas. . . . Whether the Commission heard evidence or not is immaterial; it is not required to take testimony or make findings of fact before promulgating its orders. Such procedure is foreign to the law of Texas, although customary under federal statutes. If the facts in existence when the order was made, as later shown by evidence before the court, were such that reasonable minds could not have reached the conclusion arrived at by the Commission, or if the agency exceeded its power, then the order should be set aside by any court of competent jurisdiction." 130 F. 2d 10, 14–15.

Clearly, therefore, the scope of judical review in a Rule 37 case, as declared by the Supreme Court of Texas, is precisely as well defined, for example, as the scope of judicial review by the federal courts of orders of the Interstate Commerce Commission or the National Labor Relations Board. That the scope of review may be different does not make the standards of review any less definite or less susceptible of application by a court. I think there can be no doubt that under the Constitution and laws of Texas, as construed by the decisions of the state courts, such courts exercise a judicial power in these cases precisely similar to that wielded by the federal courts under Article III. Can it be said, therefore, that in considering the

validity of an exception allowed by the Texas Railroad Commission under Rule 37, the federal judges sitting in that state are engaged in duties which are foreign to their experience and abilities? Judges who sit in judgment upon the legality of orders made by the Interstate Commerce Commission are certainly not incompetent to apply the narrowly defined standards of law established by Texas for review of the orders of its Railroad Commission.

We come, then, to the question whether Texas has manifested any desire to confine such review to the state courts sitting in Travis County. A little history will go a long way in answering this question. On April 3, 1891, the Texas legislature enacted a statute creating the Texas Railroad Commission. Section 6 provided that suits to set aside Commission orders could be brought "in a court of competent jurisdiction in Travis County, Texas." And, naturally enough, the question soon arose whether this provision prevented review in the federal court sitting in Travis County. Almost fifty years ago there came before this Court a memorable litigation in which the meaning and purpose of the provision were thoroughly canvassed. In *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 391–92, decided May 26, 1894, this Court unanimously held that "it may be laid down as a general proposition that, whenever a citizen of a State can go into the courts of a State to defend his property against the illegal acts of its officers, a citizen of another State may invoke the jurisdiction of the Federal courts to maintain a like defence. A State cannot tie up a citizen of another State, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts. . . . We need not, however, rest on the general powers of a Federal court in this respect, for in the act before us express authority is given for a suit against the commission . . . The language of this provision [§ 6 of the

1891 statute] is significant. It does not name the court in which the suit may be brought. It is not a court of Travis County, but in Travis County. The language differing from that which ordinarily would be used to describe a court of the State was selected apparently in order to avoid the objection of an attempt to prevent the jurisdiction of the Federal courts."

For almost fifty years the holding in the *Reagan* case has not been questioned. On the contrary, it has always been taken for granted that the District Court for the Western District of Texas is "a court of competent jurisdiction in Travis County" and a suitable forum in which to challenge the validity of orders of the Texas Railroad Commission. One need only look at the tables of cases in both the lower federal courts and in this Court to obtain a sense of the solidity of this exercise of jurisdiction. Section 8 of Article 6049c, the Texas legislation immediately before us, was originally enacted in 1932. The Texas legislature might expressly have sought to restrict judicial proceedings with respect to Commission orders to the state courts of Travis County. This it has done in other situations. See *e. g.*, Art. 911e, § 10 of Vernon's Revised Civil Statutes, 1925 (appeal by applicant for transportation agent's license from denial of application by Railroad Commission); Art. 3286 (suits by heirs or claimants to escheated lands); Art. 5032 (appeals from revocation or suspension of authority with respect to reciprocal insurance); Art. 8307, § 7 (suits to recover penalties from employers failing to report injuries under workmen's compensation law). In these statutory provisions jurisdiction is specifically limited to the "District Court in Travis County, Texas," the state court. But in Article 6049c the Texas legislature used the phrase "in a court of competent jurisdiction in Travis County," precisely the same as that which had been construed by this Court in the *Reagan* case. How, then,

can it be fairly said that the Texas legislature meant to exclude the federal courts from exercising jurisdiction in these cases?

And so, the case really reduces itself to this: in the actual application of the standards governing judicial review of Commission orders allowing exceptions under Rule 37—standards which today have been authoritatively and precisely defined—a different result may be obtained if suit is brought in the federal rather than the state courts. And why? Because federal judges are less competent and less fair than state judges in applying the rules that are binding upon both? If this were true here, it would be equally true as applied to almost all types of litigation brought into federal courts to enforce state-created rights. The explanation may perhaps lie in the realm of what has sometimes been called "psychological jurisprudence." In the assessment of evidence and the other elements which enter into a judicial judgment, a federal judge may make judgments different from those which a state judge may make. Federal judges are perhaps to be regarded as men apart—judges who cannot be trusted to judge fairly and impartially. But if this be our premise, why should it not follow that the federal courts are, because of their putative bias, to be denied the right to hear insurance cases, or cases involving controversies between debtors and creditors, landlords and tenants, employers and employees, and all the other complicated controversies arising out of the local law of the forty-eight states?

It is the essence of diversity jurisdiction that federal judges and juries should pass on asserted claims because the result might be different if they were decided by a state court. There may be excellent reasons why Congress should abolish diversity jurisdiction. But, with all deference, it is not a defensible ground for having this Court by indirection abrogate diversity jurisdiction when, as a matter of fact, Congress has persistently refused to restrict

such jurisdiction except in the limited area occupied by the Johnson Act. The Congressional premise of diversity jurisdiction is that the possibility of unfairness against outside litigants is to be avoided by providing the neutral forum of a federal court. The Court today is in effect withdrawing this grant of jurisdiction in order to avoid possible unfairness against state interests in the federal courts. That which Congress created to assure impartiality of adjudication is now destroyed to prevent what is deemed to be hostility and bias in adjudication.

Of course, the usual considerations governing the exercise of equity jurisdiction are equally applicable to suits in the federal courts where jurisdiction depends upon the diversity of the parties' citizenship. The chancellor certainly must balance the equities before granting relief; he should stay his hand where another court seized of the controversy can do justice to the claims of the parties; he may refuse equitable relief where the asserted right is doubtful because of the substantive law which he must find as declared by the state. But it is too late in the day to suggest that the chancellor may act on whimsical or purely personal considerations or on private notions of policy regarding the particular suit. It is not for us to say that litigation affecting state laws and state policies ought to be tried only in the state courts. Congress has chosen to confer diversity jurisdiction upon the federal courts. It is not for us to reject that which Congress has made the law of the land simply because of our independent conviction that such legislation is unwise.

This is not just an isolated case. To order the dismissal of this litigation, on this record and in the present state of Texas law, is not merely to decide that the federal court in Travis County, Texas, should no longer entertain suits brought under the Texas conservation laws. We are holding, in effect, that the enforcement of state rights created by state legislation and affecting state policies is limited

to the state courts. It means, candidly, that we should reëxamine all of the cases—and there have been many—since the *Reagan* decision almost half a century ago. Do we not owe it to the lower federal courts, for example, to tell them where a case like *Texas Pipe Line Co. v. Ware,* 15 F. 2d 171, now stands? In that case the federal court entertained a suit to enforce rights arising under a state workmen's compensation law. Would it be error for a federal judge to do so today? See, also, *Lane* v. *Wilson,* 307 U. S. 268.

Perhaps no judicial action calls for a more cautious exercise of discretion than the appointment of a receiver by a court of equity, especially where the enterprise to be administered relates to important public interests. Such a situation was presented to this Court in *Pennsylvania* v. *Williams,* 294 U. S. 176, in which—solely on the score of diversity of citizenship—a federal court was asked to assume the management of a Pennsylvania building and loan association. The problem before this Court was not whether the controversy should be adjudicated by a federal rather than a state court, but whether, as a matter of sound judicial administration, a court of equity should take hold of the affairs of the association by putting a judicial officer in charge when in fact the state had established an administrative system whereby "the duty of supervising its own building and loan associations and of liquidating them by an adequate procedure when insolvent," 294 U. S. at 184, was entrusted to a permanent, experienced state agency. The question was not at all whether a federal court should abdicate its authority in favor of a state court where the rules of law which would govern a suit in a state court would be precisely the same as those which a federal court would be bound to apply. The *Williams* case, in other words, is but an application of the traditional doctrine that a court of equity should stay its hand from the improvident appointment of a receiver.

To talk about courts as "working partners" with administrative agencies whenever there is judicial review of administrative action is merely another way of saying that legislative policies are enforced partly through administrative agencies and partly through courts. See *United States* v. *Morgan,* 307 U. S. 183, 191. But the use of such colloquial expressions can hardly obliterate the distinction between judicial power and legislative power, whether the latter be exercised directly by the legislature or indirectly through its administrative agencies. The courts of Texas sit in judgment upon the Railroad Commission of Texas only in so far as they have been charged by Texas law with the duty of ascertaining the validity of Commission action. They no more "participate in the fashioning of the state's domestic policy" than the federal courts participate in the fashioning of the transportation policy of the federal government in reviewing orders of the Interstate Commerce Commission under the Urgent Deficiencies Act, 38 Stat. 219, 28 U. S. C. § 47.

Therefore, unless all functions of courts heretofore deemed to be judicial in nature even though they involve appropriately defined review of actions taken by administrative agencies are now to be deemed administrative in nature, the circumstance that a right asserted before a court arises from a controversy that originated before an administrative agency cannot alter either the nature of the power being exercised by the court or its capacity to entertain jurisdiction. One might choose, for example, to describe this Court as the "working partner" of the Securities and Exchange Commission, the Comptroller of the Currency, the Commissioner of Internal Revenue, and the score of other administrative bodies the validity of whose actions frequently comes here for review. But such a characterization of our rôle in reviewing administrative orders does not make this exercise of our power any the

less judicial or any the more administrative. Nor should it be adequate to wipe out a distinction that is so embedded in our constitutional history and practice.

The opinion of the Court cuts deep into our judicial fabric. The duty of the judiciary is to exercise the jurisdiction which Congress has conferred. What the Court is doing today I might wholeheartedly approve if it were done by Congress. But I cannot justify translation of the circumstance of my membership on this Court into an opportunity of writing my private view of legislative policy into law and thereby effacing a far greater area of diversity jurisdiction than Senator Norris, as chairman of the Senate Judiciary Committee, was ever able to persuade Congress itself to do.

MR. JUSTICE ROBERTS and MR. JUSTICE REED join in this dissent.

The CHIEF JUSTICE expresses no views as to the desirability, as a matter of legislative policy, of retaining the diversity jurisdiction. In all other respects he concurs in the opinion of MR. JUSTICE FRANKFURTER.