DIANA GRIBBON MOTZ, Circuit Judge,
dissenting from the denial of rehearing en banc:
A panel of this court has taken the dramatic, some would say bold, step of withdrawing our jurisdiction over an important set of cases in which federal rights are at stake. It has done so by way of an abstention principle, assertedly derived from the Supreme Court’s Burford doctrine, but fundamentally of its own making. Because this holding involves the scope of our most basic obligation as judges — to hear cases arising under the laws of the United States — a review by all of the court’s active judges would seem particularly appropriate here. I regret, and dissent from, our decision not to rehear this case en banc.
The case arrived in federal district court on removal by the defendants, who are operators of video poker machines in South Carolina. Having successfully removed the case to federal court, a group of the video poker operators then proceeded to argue that federal jurisdiction was inappropriate. A panel of this court agreed, holding that the district court should have abstained, under the doctrine of Burford v. Sun Oil, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), from deciding whether the video poker operators violated South Carolina’s statutorily-imposed $125 limit on payouts from video poker machines and, if so, whether this constituted a “special inducement” or an unfair trade practice under South Carolina law. The plaintiffs’ RICO claim, which they had filed in state court, and upon which the defendant operators of video poker machines had based their removal to federal court, was ordered stayed. Although the panel seems to have been chiefly concerned with the asserted errors in the district court’s decree, it nonetheless held that the court should have abstained altogether from hearing the case.
I do not believe the panel’s decision squares with even the most expansive understanding of the Burford doctrine. The clearest recent statement on the scope of Burford comes in New Orleans Public Service, Inc. v. Council for the City of Neiu Orleans, in which the Supreme Court held that “a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are ‘difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar’; or (2) where the ‘exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.’ ” Id., 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)).
In citing this language, the panel omits the underscored part of the quote and, in doing so, omits from its holding Burford’s most basic principle: that federal courts should “decline to interfere with the proceedings or orders of state administrative agencies.” Here, there was no interference of the sort that Burford recognizes, *578 nor was there a comprehensive administrative scheme with which to interfere.
Read to its outer limits, Burford applies in two related sets of circumstances. First, Burford mandates that when a state has decided to reach a public policy problem through a comprehensive administrative scheme, federal courts should not “interfere” by telling state officials how to make the decisions that the state has charged them with making. In other words, federal courts should not be doing the work of local zoning boards, of family courts, of railway commissions, of water conservation authorities, or the like. This case did not raise the specter of such interference. It involved only the interpretation of state law — not the question of whether to grant a license, a permit, a variance, or of the appropriateness of alimony payments. The plaintiffs did not seek to challenge such an administrative order, and indeed, there was no administrative body to which the plaintiffs might have turned to get relief in the first instance.
Second, Burford counsels abstention when a federal court, by deciding a case, would create substantial disuniformity in a field where multiple actors have interlocking interests, and on which the state, recognizing the complexity of the field, has erected some regulatory architecture. Here, the defendants’ entitlement to operate video poker machines is not interwoven with the rights of other video poker operators in the way that, quintessentially, landowners’ activities fundamentally burden one another, or that the drilling of oil in a Texas field might “drain oil from the most distant parts of the reservoir.” Burford, 319 U.S. at 319, 63 S.Ct. 1098. Although enforcement of the law against particular actors almost always gives rise to a certain kind of disuniformity — in the sense that other actors may escape enforcement— that is not the sort of disuniformity with which Burford is concerned.
Every instance in which Burford has been applied by the Supreme Court or this court has involved a party seeking a decision that, in at least one of the two ways I have described, would have supplanted the work of an administrative agency or a state court with specialized jurisdiction. See Alabama Public Service Commission v. Southern Railway, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (decision by commission to require railroad to continue operation of unprofitable line); Bur-ford, supra (decision by commission to grant oil drilling permit); Pomponio v. Fauquier County Board of Supervisors, 21 F.3d 1319 (4th Cir.1994) (en banc) (local zoning decision); Palumbo v. Waste Technologies Industries, 989 F.2d 156 (4th Cir.1993) (grant of permit by Ohio Environmental Protection Agency for hazardous waste incinerator); Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal, 945 F.2d 760 (4th Cir.1991) (local zoning decision); Brandenburg v. Seidel, 859 F.2d 1179 (4th Cir.1988) (liquidation of failed savings and loan by state-appointed receiver and decisions of state receivership court); Meredith v. Talbot County, 828 F.2d 228 (4th Cir.1987) (local zoning decision); Browning-Ferris v. Baltimore County, 774 F.2d 77 (4th Cir.1985) (same); Caleb Stowe Assocs. v. County of Albemarle, 724 F.2d 1079 (4th Cir.1984) (same). See also Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (discussing applicability of Burford to suit by state insurance commissioner).
Here, by contrast, the district court was asked to decide a set of relatively straightforward state law questions: What is the meaning of the gaming statute’s $125 payout limit? Would violation of that limit constitute a “special inducement” or an unfair trade practice? There is no state administrative agency or specialized court charged with making these determinations — nor do these determinations raise issues that would seem to require administrative expertise. Rather, these are the sort of questions that judges routinely face, and at least one of them, according to *579 the South Carolina Supreme Court, was not even particularly difficult. In Gentry v. Yonce, that court held that the $125 payout limit “states exactly what it means.” 337 S.C. 1, 522 S.E.2d 137, 143 (1999) (“We will reject a meaning when to accept it would lead to a result so plainly absurd that it could not have been intended by the Legislature or would defeat the plain legislative intention.”). South Carolina’s highest court went on to note that the district court here had analyzed the payout limit, and the possibility that a violation of the limit might serve as a predicate for a RICO violation, in a manner “consistent” with its own opinion. See id. 522 S.E.2d at 143 n. 18.
The panel evidently does not think that a federal district court should broach these questions, but its rationale for refusing to exercise jurisdiction has nothing to do with whether the state of South Carolina has empowered certain administrative agencies to inspect and license video poker machines. Rather, the abstention principle implicit in the panel’s opinion would seem to apply regardless of the enforcement mechanism chosen by a state, even in the complete absence of an administrative scheme. The abstention doctrine applied by the panel directs that: a federal court should abstain from decision whenever a case 1) largely turns on state law issues, and 2) involves a matter of traditional state concern, particularly when 3) it implicates an issue of controversy in the state.
Even if established precedent recognized such an abstention principle, which it does not, that principle well might not apply in this case. Arguably, at least, plaintiffs’ RICO claim was at the core, and not the periphery, of their case against the video poker operators. The panel majority’s characterization of the RICO claim as a “Trojan horse” to get into federal court certainly seems unfair, in view of the fact that plaintiffs were content to litigate it in state court. Furthermore, it is not at all clear that gambling is an issue as quintessentially “local” as the panel claims. The panel’s assumption about the local nature of gambling sits in tension with RICO itself, in which Congress, grappling with a set of problems it believed to be national in scope, specifically referred to gambling in defining “racketeering activity.” See 18 U.S.C. § 1961(1)(A)(1994 & Supp. IV 1998).
In evaluating the merits of the panel’s preference for state' court adjudication, I need not go much beyond the principle’s novelty. As the concurring opinion correctly noted, we are an inferior federal court; “we derive our very existence from the Congress, and we accept our jurisdiction largely from that Branch.” It seems to me that, as such, we are a far-from-ideal vehicle for the enunciation of a new prudential exception to the jurisdiction that Congress has given us.
The abstention doctrines are derived, not from Article III or from the jurisdictional statutes, but rather from the “sound equitable discretion” of the federal courts. See Burford, 319 U.S. at 318, 63 S.Ct. 1098. The panel opinion warns that the abuse of equity power may “thwart the expression of the democratic will.” At the same time, the panel deploys its own equitable powers to diminish the force of democratic enactments at both the federal and state levels. It fashions an exception to the Congressional grant of jurisdiction and, in doing so, impedes the enforcement of RICO and of South Carolina’s gaming and unfair trade practices laws — all themselves unmistakable expressions of the democratic will.
It is not clear to me where the limits of the panel’s new abstention principle lie. By overstating the applicability of Burford here, the panel obscures the doctrinal boundaries of the abstention principle implicit in its opinion. I am not certain how far the panel’s preference for state court adjudication goes, and I am most concerned that, because of this lack of clarity, the panel’s abstention principle will be applied in ways that we cannot anticipate.
*580 At the very least, en banc review would have enabled us to focus more attention on what some of these unanticipated applications might be, and to sharpen the doctrinal boundaries of the principle itself. I myself doubt the wisdom of this contraction of federal court jurisdiction, and I question whether such a potentially sweeping change properly originates in our chambers. With all respect to my good colleagues, I dissent.
Judge King has authorized me to indicate that he joins in this dissent.