### SEABOARD AIR LINE RAILROAD COMPANY, Appellant,

v.

### SARASOTA–FRUITVILLE DRAINAGE DISTRICT, Appellee.

No. 16590.

United States Court of Appeals
Fifth Circuit.

Jan. 14, 1958.

---

3. Voltz v. United States, 5 Cir., 1952, 196 F.2d 298, 299; United States v. Jakalski, 7 Cir., 1956, 237 F.2d 503, 505.

584

Morris E. White, Michael L. Kinney, Tampa, Fla., for appellant.

Charles E. Early, Sarasota, for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The sole question presented here is whether a Florida Drainage District admittedly not liable for torts as such under Florida law, Rabin v. Lake Worth Drainage Dist., Fla., 82 So.2d 353, certiorari denied 350 U.S. 958, 76 S.Ct. 348, 100 L.Ed. 833; Arundel Corp. v. Griffin, 89 Fla. 128, 103 So. 422, is liable to a Railway on an indemnity-hold-harmless agreement in a canal right of way easement granted by the Railway 28 years before. The District Court held that it was not and accordingly dismissed the complaint for failure to state a claim, Fed.Rules Civ.Proc. 12, 28 U.S.C.A.

The specific claim was to recover approximately $28,000 in losses sustained by the Railway as a result of one of its trains being derailed December 5, 1953, with consequent damage to its equipment and personal injury to persons. It was alleged that the derailment was caused by the lowering by the District of its ditches

adjacent to the District's undertrack culverts, so that the roadbed gave way and the underlying support to the tracks was lessened.

In 1925 the Railway, for a nominal stated cash consideration ($5) but " * * in further consideration of the faithful performance by the [District] of [its] covenants * * *," granted the right to lay, maintain, operate and use two specified culvert crossings under its tracks and right of way. The District was expressly required to pay all costs in the initial installation as well as in the maintenance, use, repair and removal of the facilities.[1] And, of crucial importance here, the District expressly agreed:

> "8. The Licensee [District] hereby assumes all risk of loss, injury or damage of or to the person and the property of the Licensee [District] and all other persons and property, growing in any manner out of the installation, presence, operation, maintenance or removal of said lines of pipe, or any of the appurtenances or appliances, or any part thereof. And the Licensee [District] will further, at all times, indemnify and save harmless the Railway from all loss, damage, cost and expense which the Railway may sustain, resulting from loss, injury or damage caused as aforesaid."

What the scope of the indemnity may be, whether, on proof, it covers this occurrence, whether if, as suggested, it arose from the Railway's negligence not within the reach of this terminology, are questions not before us. All the Court below decided, all that confronts us, is the assertion that this indemnity undertaking was beyond the power of a Florida drainage district so that the District could not be liable either on the contract or by estoppel.

We recognize that making our way as best we can in our *Erie* lights, there is especial reason that we faithfully search out and apply the Florida law. Here we deal not only with Florida law as jurisprudence, but our decision necessarily affects Florida in its political adjustments between members of the public and public creatures of the sovereign. Not the least of the difficulties in the process is that if we err, or if experience proves our decision unsound, unlike the Courts of Florida, we do not have the means or opportunity for correction. Our function is not aided, our travail not lessened, by handy labels of "strict" or "conservative" approach or the like. If, in this problem concerning which Florida has not yet written, it is the Florida policy to recognize the validity of such contracts where property interests are acquired by them, it would not be "strict" construction or "conservative" to hold to the contrary out of some supposed notion that, when in doubt, the judicial function is to lean backwards, not forward.

---

1. "3. The lines of pipe shall be installed, maintained, repaired and renewed at the expense of the Licensee [District] and under the supervision and direction, and subject to the approval and acceptance, of the Chief Engineer of the Railway.
　*　　*　　*　　*　　*
"5. The Licensee [District] will make all repairs to the tracks and other property of the Railway necessitated by the installation, operation, use, maintenance or removal of said lines of pipe * * * The Railway may, at its option, make such repairs, and the Licensee [District] will * * * promptly reimburse the Railway therefor.
"6. Should the Licensee [District] discontinue the operation of said lines of pipe * * * said lines of pipe shall be removed by the Licensee [District] at the expense of the latter, from beneath the tracks and from the property of the Railway, or the Railway may, at its option, remove the same, at the expense of the Licensee [District]. In case of such removal, * * * the tracks and property of the Railway are to be left in as good condition as when previously found * * *.
"7. The Railway may terminate this agreement at any time by giving the Licensee [District] thirty days notice * * * and upon termination * * * the Licensee [District] * * * will, at his own expense, remove said lines of pipe * * * from beneath the tracks and from the property of the Railway, or the Railway, * * * may remove the same, at the expense of the Licensee [District]."

Consequently, what is the starting point remains just that and is not, as the District urges, the final solution as well. There seems to be little disagreement that Florida treats drainage districts as a special governmental body created for a limited and definite purpose with limited authority and a limited power to tax.[2]

The approach, as it is for related drainage districts, is that "The creative statute is a grant of power and the supervisors of the district must look entirely to the statute for their authority." State ex rel. Davis v. Jumper Creek Drainage District, 153 Fla. 451, 14 So.2d 900, 901. As these statutes set out the various powers in much detail, "The careful enumeration of these powers is an indication that this board was not to have any others than those enumerated. * * *" Forbes Pioneer Boat Line v. Board of Commissioners of Everglades Drainage District, 77 Fla. 742, 82 So. 346, 351.

From this emphasis on the necessity for *express* powers, the District urges that, in contrast to the Florida rule for counties investing them also with "* * * implied authority to use means necessary to make the expressed power effective * * *," Molwin Investment Co. v. Turner, 123 Fla. 505, 167 So. 33, a district does not have the power to do those things reasonably necessary to carry out the express power.

We think that giving full voice to this approach, the inquiry remains one of statutory authorization, and as to that, we conclude that this type of contract is authorized.

Under one statutory provision, a district "* * * shall have the right to hold, control and acquire by donation or purchase and if need be, condemn any land, easement, railroad right of way[3] * * *," and under another it "* * * may acquire by gift, purchase, exchange, donation or condemnation, * * * lands * * * for canal right of ways[4] * * *."

The acquisition of right of way for ditches, culverts, and canals is an absolute essential to the operation of a drainage district. A district has the express power to acquire and hold property. Whether this easement contract is an "exchange" of a right in land from the Railway in return for the promises of the District in paragraph 8, and those detailed in note 3, supra, we need not narrowly determine. Neither do we resolve it narrowly as a "purchase." The two terms, used in parallel, reflect a purpose to allow some latitude in the choice of means by which the property right is obtained.

The express right to resort to condemnation is a positive assurance that needed property will be acquired. It reinforces the inference that it was to be left to the good faith managerial judgment of the district authorities to determine the relative advantages or disadvantages in the various available means of acquiring the needed facilities. The

2. See, Halifax Drainage Dist. of Volusia County v. State, 134 Fla. 471, 185 So. 123; State ex rel. Root v. Crandon, 115 Fla. 153, 155 So. 667; Hardee v. State, 83 Fla. 544, 91 So. 909; Forbes Pioneer Boat Line v. Board of Commissioners of Everglades Drainage District, 77 Fla. 742, 82 So. 346; Arundel Corp. v. Griffin, 89 Fla. 128, 103 So. 422; 11 Fla.Jur., Drainage and Drainage Districts, § 9.

3. Florida Statute, Sec. 298.22, the district may "* * * construct and maintain * * * ditches, canals * * *; construct any and all of said works and improvements across, through or over any public highway, railroad right of way, track, grade, fill or cut * * *;

and shall have the right to hold, control and acquire by donation or purchase and if need be, condemn any land, easement, railroad right of way, * * * for right of way * * *."

4. Fla.Stat., § 298.62:
"Any and all drainage and sub-drainage districts created or organized under the laws of the State of Florida may acquire by gift, purchase, exchange, donation or condemnation, any lands within or without the said district for canal right of ways, or for other general purposes of the said district, and if acquired by condemnation the procedure shall be as prescribed in chapter 73."

consideration for the property might be the payment of a lump sum in cash along conventional lines or the payment of stated sums over a fixed period of time. The right and obligation to pay flows from the power to acquire.

But its nature is not altered if the consideration is not cash, but an agreement to do a specific thing. For example, the undertaking in paragraph 5, note 3, supra, to make and pay for repairs to the Railway's property occasioned by maintenance work, removal or replacement of the culverts is certainly reasonable. Could one seriously question the obligation of the district to do these things even had its easement or title been acquired by condemnation? A parallel of this, and just as reasonable, is the undertaking in paragraph 8 imposing on the district responsibility for " * * * loss, injury or damage of or to the person and the property of the Licensee [District] * * *." Each of these is an essential ingredient to the act of the Railway in granting the right. While the subsequent undertaking in paragraph 8 to indemnify is an additional obligation, the basic nature of it as a consideration moving the Railway to make the grant remains the same.

The legislature has invested the district with authority to acquire by purchase or exchange. It has not prescribed how or in what manner that purchase must be effected, nor the nature or duration of the title. The statutes do not demand that the consideration for the purchase must be cash, now or later. To use a promise as the consideration is a part of the express power (and its exercise) to acquire by purchase-exchange.

■ Independent of concepts of estoppel which we need not pass on, this approach seems to be a sensible, reasonable businesslike recognition that where one obtains the right to, or use of, property by agreements which are traditional in nature, any such agreement is not a collateral undertaking, but is, in reality, a part of such acquisition. If the property, or the right to its use, comes from the agreement, the agreement, reasonably related to the purpose of the acquisition, is as valid as the ownership. The one does not exist without the other. This concept has been well expressed in H. Hohensee Construction Co. v. Chicago, M. St. P. & P. Ry. Co., 218 Wis. 390, 261 N.W. 242, 243:

> "This enumeration of powers implies the power to enter into an agreement of indemnity whenever such an agreement is necessary to its protection or is to its advantage in connection with any contract it has express power to make. * * If it may accept a gift of land for sewer purposes, it may accept it subject to such conditions as accompany the gift. If it may accept a gift of land for such purpose, it may accept a gift of an easement in land for such purpose. If it may purchase land for such purpose, it may purchase an easement in land for such purpose. If it may purchase an easement for such purpose, it may purchase it without other consideration therefor than a promise to indemnify the donor against liability resulting from the use covered by the easement, and against liability to which it is subjected during the making of the structure."

We recognize that it is probable in some states, and perhaps possible as to some others, that the respective courts would consider an indemnity agreement beyond the power of the subordinate governmental entity.[5] Some of them, e. g.,

---

5. See, e. g., these cases pressed heavily by the District: Nashville v. Sutherland, 92 Tenn. 335, 21 S.W. 674, 19 L.R.A. 619; Becker v. Koekuk Water Works, 79 Iowa 419, 44 N.W. 694; People ex rel. Terbush & Powell v. Dibble, Sup., 189 N.Y.S. 29; Vaughtman v. Town of Waterloo, 14 Ind.App. 649, 43 N.E. 476; Davenport v. Pitt Cty. Drainage District No. 2, 220 N.C. 237, 17 S.E.2d 1; Wheeler v. Sault Ste. Marie, 164 Mich. 338, 129 N.W. 685, 35 L.R.A., N.S., 547; American Malleables v. Town of Bloomfield, 82 N.J.L. 79, 81 A. 500, affirmed 83 N.J.L. 728, 85 A. 167.

Vaughtman v. Town of Waterloo, note 5, supra, and Wheeler v. Sault Ste. Marie, note 5, supra, emphasize particularly the usual incapacity to make a surety or guaranty contract. But the contract here is not really comparable to a traditional surety bond or undertaking to answer for the obligations of another. Whatever the ultimate uncertainty might be as to the significance, if any, of the presence or lack of negligence on the part of the District or Railway or both, the contract makes positive that it relates in an operational realistic sense to the activities of the District. By its terms the losses covered are confined to those " * * * growing in any manner out of the installation, presence, operation, maintenance or removal of said * * * " facilities.

■ Nor is there any basis for the fear that this subjects a drainage district to a perpetual uncertain liability for unpredictable amounts. The District may subject the matter to a continuous review to determine the current wisdom of retaining essential property acquired by the making of these promises, rather than through the expenditure of cash resources by voluntary purchase or by condemnation. Upon such review, the district is free to determine a contract of this kind for a voluntary grant of an easement subject to a thirty-day cancellation and obtain an absolute right or title free of conditions by condemnation proceedings.

■ While estoppel need not, if it could, be invoked to sustain an action beyond a district's power, see Hoskins v. City of Orlando, 5 Cir., 51 F.2d 901, it may well be where, as has now been done by us, the question of power has been resolved and all that remains is the manner of its exercise. This would include the assertion of the subsidiary contention that the contract whose benefits have been enjoyed for 28 years had not been executed by the proper officers or with adequate formalities. For Florida rec-

ognizes a basic distinction that " * * the principle of estoppel does not operate to confer authority, though it may under some circumstances be invoked to preclude a denial that authority conferred was duly exercised." State ex rel. Nuveen v. Greer, 88 Fla. 249, 102 So. 739, 744, 37 A.L.R. 1298.

It follows that a claim was stated, and the cause must be reversed and remanded for further and not inconsistent proceedings.

Reversed and remanded.

RIVES, Circuit Judge (dissenting).

I agree with the learned district judge that the Florida Drainage District "had no authority to bind itself as an indemnitor as consideration for the acquisition of an easement." Further, it seems to me that what the Drainage District actually acquired from the Railroad does not rise to the dignity of an easement, but is nothing more than a mere license. That is shown by the contract as a whole and particularly by paragraph 7 thereof:

"7. The Railway may terminate this agreement at any time by giving the Licensee thirty days notice, in writing, of its intention so to do, and upon termination of this agreement the Licensee, if required by the Railway so to do, will, at his own expense, remove said lines of pipe and all appliances or appurtenances thereunto belonging, from beneath the tracks and from the property of the Railway, or the Railway, at its option, or upon the refusal of the Licensee so to do, may remove the same, at the expense of the Licensee."

Florida gives full recognition to the difference between an easement and a license, an easement being an interest in land permanent in nature, while a license is a mere privilege to do some act or acts upon the lands of another.[1]

1. See Seaboard Air Line Ry. Co. v. Dorsey, 1932, 111 Fla. 22, 149 So. 759, 761; Burdine v. Sewell, 1926, 92 Fla. 375, 109 So. 648, 652; J. C. Vereen &

Florida Statute, § 298.22, quoted in pertinent part in footnote 3 to the majority opinion, gives the Drainage District authority to acquire " * * * any land, easement, railway right of way * * * for right of way * * *." Section 298.62, quoted in footnote 4 of the majority opinion, gives the District authority to acquire " * * * any lands within or without the said district * * *." Nowhere can there be found authority to enter into an executory contract for the acquisition of a mere revocable license.

A drainage district in Florida is a governmental body with a limited sphere of operation and limited powers, and with no power or authority other than that conferred by statute.[2]

The authority to enter into the contract of indemnity, here sought to be enforced, cannot be derived from the authority to "purchase" or "exchange" "lands" or an "easement." The word "purchase" in common usage means to obtain property by paying an equivalent in money.[3] "Exchange" is a word of precise import meaning the giving of one thing for another and requiring the transfers to be in kind.[4] The Florida statutes do not expressly or impliedly authorize the Drainage District to bind itself by future promises contained in an executory contract any more than they authorize the District to bargain for or acquire a mere license or personal privilege for a right of way.

The Wisconsin case of H. Hohensee Construction Company v. Chicago, M., St. P. & P. Ry. Co., 218 Wis. 390, 261 N.W. 242, 243, is distinguishable because the City of Milwaukee had much broader powers than the Florida Drainage District. A later Wisconsin case, Pohland v. City of Sheboygan, 251 Wis. 20, 27 N.W.2d 736, 739, pointed out that that case should not be construed to hold that the city can make an indemnity contract "except so far as it is necessary for its own protection." It was not necessary here for the Drainage District to make a contract of indemnity for, if it could not agree with the Railroad on the purchase of a right of way, the Florida statutes vested in the Drainage District the power of condemnation.

No principle of estoppel can apply against the Drainage District, because it is a creature of the general statutes and all persons dealing with it are charged with notice of the limitation of its powers.[5]

It has been clearly established that a drainage district is not liable for its torts. Rabin v. Lake Worth Drainage District, Fla.1955, 82 So.2d 353. One of the grounds for that immunity was thus expressed by the Supreme Court of Florida:

"The district has the power only to assess against lands within its boundaries assessments to accomplish an over-all drainage operation to make the lands within the whole area cultivable and keep them so. The assessments for main and subsidiary canals are made against the individual parcels of lands according to the benefit each parcel will receive from the project as a whole. Hearings are conducted so that any property owner aggrieved by the as-

Sons v. Houser, 1936, 123 Fla. 641, 167 So. 45, 47; 17 Am.Jur., Easements, § 4; 28 C.J.S. Easements § 2b.

**2.** Forbes Pioneer Boat Line v. Board of Com'rs, 1919, 77 Fla. 742, 82 So. 346, 350; Halifax Drainage District of Volusia County v. State, 1938, 134 Fla. 471, 185 So. 123, 129; State ex rel. Davis v. Jumper Creek Drainage District, 1943, 153 Fla. 451, 14 So.2d 900, 901.

**3.** 35 Words and Phrases, Purchase, p. 477.

**4.** 15A Words and Phrases, Exchange pp. 131, et seq.

**5.** State ex rel. Davis v. Jumper Creek Drainage District, 1943, 153 Fla. 451, 14 So.2d 900, 901. See, also, Mayor, etc. of City of Nashville v. Sutherland, 92 Tenn. 335, 21 S.W. 674.

sessment may be heard. The financing of the improvement is based on the total assessment, the obligation undertaken to construct the project is discharged from the assessments paid. How could the district be coerced to pay any judgment obtained in a tort action except on the theory that by the commission of the tort the lands in the district were benefited?" 82 So.2d at page 355.

The immunity of the drainage district from liability for torts is for the benefit of the landowners of the district and to insure that their tax moneys will be applied to the purposes for which the drainage district was established.

The same public policy of the State of Florida which immunizes the Drainage District from liability for its torts should apply with all the more force to forbid it to enter into an indemnity agreement covering but not limited to losses resulting from the negligence or fault of the Drainage District.

When the Florida Legislature and its courts have thus declared the public policy of the State, that policy should not be nullified by the contract of the supervisors of the district.

I would affirm the judgment of the district court. If, however, its judgment is to be reversed, then, considering the nature of this action, its importance to the Drainage District, and to the execution of the policies of the State of Florida, I would not think that the form of the action as being at law instead of in equity ought to prevent the federal district court, as a matter of sound discretion, from declining to exercise its jurisdiction until the State courts can authoritatively settle the questions of State law.[6]

I respectfully dissent.

---

6. Commonwealth of Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841; Burford v. Sun Oil Co., 319 U.S. 315, 318, 63 S.Ct. 1098, 87 L.Ed. 1424; Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 297, 63 S.Ct. 1070, 87 L.Ed. 1407; Meredith v. City of Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 88 L.Ed. 9; Alabama Public Service Commission v. Southern Ry. Co., 341 U.S. 341, 349, 350, 71 S.Ct. 762, 95 L.Ed. 1002; Leiter Minerals, Inc. v. United States, 1957, 352 U.S. 220, 229, 77 S.Ct. 287, 1 L.Ed.2d 267.