**SEABOARD AIR LINE RAILROAD COMPANY, Appellant,**

v.

**SARASOTA–FRUITVILLE DRAINAGE DISTRICT, Appellee.**

No. 16590.

United States Court of Appeals
Fifth Circuit.

May 15, 1958.

See also 5 Cir., 255 F.2d 626.

Morris E. White, Michael L. Kinney, Tampa, Fla., for appellant.

Charles E. Early, Sarasota, Fla., for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

■ This is a motion for rehearing of the decision of this Court which held, one judge dissenting, that the judgment of the trial court should be reversed, 5 Cir., 251 F.2d 583. The question presented on the appeal is the validity of an agreement entered into in 1925 by which the Drainage District agreed to save the Railroad harmless "from all loss, damage, cost and expense which the Railway may sustain, resulting from loss, injury or damage * * * growing in any manner out of the installation, presence, operation, maintenance or removal of" culverts which the railroad gave the district a license, cancellable by the railroad upon 30 days' notice, to install beneath its trackage on its right of way.

On this motion the Drainage District strongly urges that such a state taxing unit cannot by contract bind itself to an obligation to respond for its acts injuring the appellant if it is not liable for such acts in absence of contract.

■ In considering a case such as this it must be borne in mind that the de-

fense of the Drainage District carries with it none of the moral stigma which attaches to the repudiation by persons sui juris of their contractual obligations. If the district is by law incapable of binding itself in this manner it is because of an overriding public policy, and moreover it is or should be as apparent to the other party to the contract as to the court which announces the principle. It is, after all, one of the oldest concepts in our system of government that the sovereign cannot be sued without its consent. This principle was succinctly stated by the United States Supreme Court in Kawananakoa v. Polyblank, 205 U.S. 349, 27 S.Ct. 526, 51 L.Ed. 834:

> "A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." 205 U.S. 349, 353, 27 S.Ct. 526, 527.

Upon careful consideration we think our previous decision too greatly emphasized the power of the district to contract for the right to traverse the railroad's right of way and ignored the critical fact that the contract here made to acquire that right embodied an agreement that may have been against public policy.

As we said in our original opinion, all are agreed that the Florida law is explicit that a drainage district created by Florida statute may not be made answerable for its torts. Arundel Corp. v. Griffin, 89 Fla. 128, 103 So. 422; Rabin v. Lake Worth Drainage Dist., Fla., 82 So.2d 353, certiorari denied 350 U.S. 958, 76 S.Ct. 348, 100 L.Ed. 833. Even though in the latter case the effort to hold the district was on the theory of an illegal taking of the plaintiff's property the Supreme Court of Florida recognized that the damage arose in tort and said:

> "The General Drainage District Act, Chapter 298, Florida Statutes, F.S.A., authorizes the levying of taxes for specific purposes stipulated in the Act. These are limited strictly to the improvement and maintenance of the drainage district and the taxing power of the Board of Supervisors cannot be exercised for any other purpose—general or special. See Campbell v. State, 133 Fla. 638, 183 So. 340. To this extent it can safely be concluded that it was not contemplated by the Legislature that a drainage district organized under the Act could be compelled to respond in damages for a tort or forced to levy taxes for this purpose." Rabin v. Lake Worth Drainage District, Fla., 82 So.2d 353, 356.

The State of Florida has a valid interest in protecting its taxpayers and citizens through public bodies such as this drainage district from certain liabilities. In determining for what purposes the taxes paid shall be put, the state has undertaken through statute and court decisions to balance the interests of individuals dealing with the districts on the one hand and the taxpayers acting through the public bodies on the other. The statutes, in light of the decided cases, give the district the power only to levy taxes for specific purposes and those purposes are limited to the improvement and maintenance of the drainage district. The District does have the power to acquire land or the use of it by purchase, but the issue is whether it can agree to pay for such purchase by a means which is contrary to the policy of the state.

Certainly the district could pay money or other valuable consideration, so long as the consideration is not one that is itself illegal. Since the district could not be liable by law in tort for its negligence or vicariously for that of others, it should not be allowed to accept such liability merely because accepting it is consideration for the acquisition of a valuable right. To hold otherwise would be to permit the district to negate a policy the state has established for the protection of its citizens by permitting the district to assume a liability or purpose

for which the taxpayer's money is to go when the legislature and the courts of Florida have said that such money must not go for that purpose.

The Florida Supreme Court has held in several cases that the fact that a taxing unit has attempted to obligate itself to use tax money in a way not otherwise authorized by making a contract that is beneficial to the taxing unit does not justify the otherwise illegal expenditure of tax funds. State, ex rel. Davis v. Jumper Creek Drainage District, 153 Fla. 451, 14 So.2d 900; National Bank of Jacksonville v. Duval County, 45 Fla. 496, 34 So. 894; Brumby v. City of Clearwater, 108 Fla. 633, 149 So. 203.

We conclude that the indemnity agreement in the contract was void and may not be enforced.

The conclusion we now reach is, we think, also in accord with the weight of authority in other jurisdictions. Nashville v. Sutherland, 92 Tenn. 335, 21 S.W. 674, 19 L.R.A. 619; Becker v. Keokuk Water-Works, 79 Iowa 419, 44 N.W. 694; Vaughtman v. Town of Waterloo, 14 Ind.App. 649, 43 N.E. 476; Wheeler v. City of Sault Ste. Marie, 164 Mich. 338, 129 N.W. 685, 35 L.R.A.,N.S., 547; Adams v. City of New Haven, 131 Conn. 552, 41 A.2d 111; Nashville Trust Co. v. City of Nashville, 182 Tenn. 545, 188 S. W.2d 342.

The motion for rehearing is granted; the decision and opinion of this Court heretofore entered are withdrawn and set aside and the judgment of the trial court is affirmed.

JOHN R. BROWN, Circuit Judge (dissenting).

To the reasons set forth in the Court's original opinion, 251 F.2d 583, I would add as the basis of my dissent a few comments.

The Court's decision is changed not for the reasons set forth by my Brother Rives in his original dissent, 251 F.2d 583, at page 588—it is changed because of the rule of sovereign immunity.

The rule of sovereign immunity is one which had its origin in a different day. It is, I believe, now thoroughly outmoded and despite the efforts of the logicians to make it appear just or wise, it is looked upon as an anachronism typical of the feudal monarchial society which gave it birth.

While in diversity litigation we are duty bound faithfully to search out and then apply state law, including a local rule of sovereign immunity, we ought not to apply it to *new* situations unless the tide of local analogous law is simply too much to stem. When faced with this problem, it is no simple answer to say that if the principle is unsound, it is for the legislature to make the change. As distasteful as it may be to conceptual purists to acknowledge a legislative consequence in adjudication, the fact remains that decision-making is actually legislating, at least in the sense of applying or extending an old principle to a new situation.

That is precisely what is really done here. For all concede that the problem here presented is *new* to Florida, and whichever way we turn, we use the Florida past as the usual working tools for the future. But while this apparent conservatism may seem to make it more palatable, the fact is that we *now* decide for the *first* time that in this *new* situation the rule of sovereign immunity has pervasive decisive force.

Where the choice is open, I think we ought not to give this transfusion to a body of law that is now so weary. If we attempt to assess what the *likely* holding of Florida would be, we ought, I think, to appraise carefully the Florida climate in this very field. Here I think the Florida atmosphere is increasingly hostile to this vestigial rule for as *new* situations arise, Florida declines to apply it. See for example State Road Department v. Bender, 147 Fla. 15, 2 So.2d 298; State Road Department v. Tharp, 146 Fla. 745, 1 So.2d 868; Kaufman v. City of Tallahassee, 84 Fla. 634, 94 So. 697, 30 A.L.R. 471; Bray v. City of Winter Garden, Fla., 40 So.2d 459; City of Miami v. Brooks, Fla., 70 So.2d 306.

Moreover the approach[1] of the Court is to obliterate the distinction between a *tort* liability and that imposed by *contract* apparently on the theory that the dollar impact on the entity would be the same.

Of course that is to disregard really ancient markers as hoary as the plea that the king can do no wrong. And it introduces a disturbing innovation in Florida law that if, on analysis, the entity would not have been liable had the judgment been rendered in a tort action, there can be no liability under an express contract.

What that does is sharply illustrated by the contract in question here by which for twenty-five years the entire District has obtained a real and essential benefit. In it the District agreed that it would make all repairs to the track and right of way necessitated by the use, maintenance or alteration of the under-track drainage lines.[2] That is a perfectly reasonable contractual undertaking. The right to make alteration and repairs and to maintain the drainage pipes gives rise to a *contractual* obligation to perform the operations in a workmanlike manner. A breach of performance would be a breach of *contract* notwithstanding the fact that it might have tort implications, see, e. g.,

Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, see especially at page 494 and footnote 5; Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, 141.

I would doubt that the most ardent advocate of sovereign immunity would claim that such a contractual undertaking was beyond the power of a Florida Drainage District if, assuming that the drainage easement was obtained by formal condemnation proceedings, the District, as a part of subsequent improvement or maintenance, went in and removed the dirt fill from under the tracks for a distance of 25 feet leaving rails and fastened ties suspended in mid-air. Would the Railroad under the state and national duty imposed upon it to run the trains be without a remedy save by the sovereign's grace?

The answer, in the light of the Court's opinion, is now at best obscure. For now the touchstone is whether the liability is a *vicarious* tort liability or is akin to it or might have been cast in such a form.

By confusing that which is basically different, by sweeping aside a jurisprudence produced by centuries of experience recognizing, especially in the field of municipal and governmental entities,

1. The Court states:
"Certainly the district could pay money or other valuable consideration, so long as the consideration is not one that is itself illegal. Since the district could not be liable by law in tort for its negligence or vicariously for that of others, it should not be allowed to accept such liability merely because accepting it is consideration for the acquisition of a valuable right. To hold otherwise would be to permit the district to negate a policy the state has established for the protection of its citizens by permitting the district to assume a liability or purpose for which the taxpayer's money is to go when the legislature and the courts of Florida have said that such money must not go for that purpose."

2. The contract provides:
"3. The lines of pipe shall be installed, maintained, repaired and renewed at the expense of the Licensee [District] and under the supervision and direction, and subject to the approval and acceptance, of the Chief Engineer of the Railway.
\* \* \* \* \*
"5. The Licensee [District] will make all repairs to the tracks and other property of the Railway necessitated by the installation, operation, use, maintenance or removal of said lines of pipe \* \* \* The Railway may, at its option, make such repairs, and the Licensee [District] will \* \* \* promptly reimburse the Railway therefor.
"6. Should the Licensee [District] discontinue the operation of said lines of pipe \* \* \* said lines of pipe shall be removed by the Licensee [District] at the expense of the latter, from beneath the tracks and from the property of the Railway, or the Railway may, at its option, remove the same, at the expense of the Licensee [District]. In case of such removal, \* \* \* the tracks and property of the Railway are to be left in as good condition as when previously found \* \* \*."

a distinction between tort and contract, we have done an unusual thing: we have made the wall of sovereign immunity higher and stronger in Florida.

I therefore respectfully dissent.