**EMPIRE DISTRIBUTORS OF NORTH CAROLINA, INC., Plaintiff,**

v.

**SCHIEFFELIN & CO., Defendant.**

No. C–C–86–389–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Jan. 19, 1988.

Dennis L. Guthrie, Murchison Guthrie & Davis, Charlotte, N.C., for plaintiff.

Armistead J. Maupin, M. Keith Kapp, Maupin Taylor Ellis & Adams, P.A., Raleigh, N.C., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendant's and Plaintiff's cross-motions for summary judgment. This case comes within this Court's diversity jurisdiction, 28 U.S.C. § 1332 (1982), and it has been removed from the Wake County Superior Court of the State of North Carolina by Defendant pursuant to Section 1441 of Title 28, United States Code.

This case centers around the North Carolina Wine Distribution Agreements Act, N.C.Gen.Stat. §§ 18B–1200—18B–1216 (1983) (the "Act"). The Act became effective when ratified on March 21, 1983, *see* 1983 N.C.Sess.Laws ch. 85, § 4, and it regulates business relationships between wineries and wine wholesalers in North Carolina, *see* N.C.Gen.Stat. § 18B–1200 (1983).

According to Plaintiff, the Act requires Defendant to ship wine to Plaintiff since there is a purported existing relationship between the parties. Plaintiff asserts that it is entitled to a permanent mandatory injunction ordering Defendant to ship its wine to Plaintiff. Defendant, on the other hand, does not want to deal with Plaintiff at all. The parties dispute the Act's constitutionality, intended coverage, and appropriate application. As explained more fully below, Defendant's motion for summary judgment will be granted because the Act does not give Plaintiff standing in the courts to seek relief from Defendant's alleged misconduct.

### FINDINGS OF FACT

#### The Parties

Defendant, Schieffelin & Co. ("Schieffelin"), is a Delaware corporation with its

principal place of business in New York. Schieffelin is authorized to do business in North Carolina, and it manufactures, imports, and sells wine in interstate and foreign commerce.

The Act defines a "winery" as "any holder of ... [a] nonresident wine vendor permit ... who sells at least 1,000 cases of wine in North Carolina per year." N.C. Gen.Stat. § 18B–1201(4) (1983). Schieffelin has North Carolina nonresident vendor permits for the sale and importation of its products, and it has shipped more than 1,000 cases of wine into North Carolina on an annual basis. *See Empire Distribs., Inc. v. Schieffelin & Co.*, slip op. at 2 (ABC Commission March 2, 1987) (final admin. determination) [hereinafter *ABC Commission Order*]. Therefore, Schieffelin is a winery under the Act.

Plaintiff, Empire Distributors of North Carolina, Inc. ("Empire"), is incorporated under the laws of the State of Georgia and is licensed to do business in North Carolina. Empire holds a North Carolina permit for the wholesale distribution of wine and beer, *see id.* slip op. at 1, and it is a wine wholesaler within the meaning of the Act, N.C. Gen.Stat. § 18B–1201(3) (1983).

### Background of the Dispute

Prior to December 5, 1984, C & G Sales Company, Inc. ("C & G") was a wholesale distributor of wine and beer holding North Carolina permits that allowed it to distribute wine in North Carolina, *see ABC Commission Order*, slip op. at 3. C & G was a wine wholesaler within the meaning of the Act, N.C.Gen.Stat. § 18B–1201(3) (1983). From July 1, 1981 until on or about December 5, 1984, C & G represented Schieffelin as a wine wholesale distributor in an eight county area in and around Mecklenburg County, North Carolina.

C & G and Schieffelin had a written agreement, dated July 1, 1981, which governed their business relationship, but that agreement and relationship was altered when the Act went into effect in 1983. The written agreement provided, inter alia, that either party could terminate the agreement, with or without cause, upon at least 30 days notice. On the other hand, the Act provides, inter alia, that "agreements" between wineries and wine wholesalers, as defined in the Act, generally cannot be amended, terminated, canceled, nonrenewed, or discontinued by wineries unless the wineries give at least 90 days prior written notice and show "good cause." N.C.Gen.Stat. §§ 18B–1204, 18B–1205 (1983). In addition, the Act prohibits a winery from unreasonably withholding its consent to a wholesaler's transfer of its business. N.C.Gen.Stat. § 18B–1206 (1983).

In December 1984, Schieffelin received two letters dated December 5, 1984: One from Empire and one from C & G. Both letters informed Schieffelin that Empire had acquired C & G and that Empire intended to take C & G's place as Schieffelin's distributor of wine. Neither Empire nor C & G asked for Schieffelin's prior approval before notifying Schieffelin of the acquisition.

On December 10, 1984, a representative of Schieffelin's wrote letters to both C & G and to the North Carolina Alcoholic Beverage Control Commission ("ABC Commission"). Schieffelin informed C & G that pursuant to section 18B–1205(f) of the Act Schieffelin was immediately terminating the distribution agreement between it and C & G because C & G had apparently gone out of the wine distribution business by discharging all sales personnel and transferring its inventory to Empire. Schieffelin notified the ABC Commission that it was terminating its relationship with C & G. In addition, Schieffelin sought the commission's permission to appoint Blue Ridge Wholesale Wine Company, Inc. of Charlotte, North Carolina ("Blue Ridge") as its wholesale distributor in the sales territory formerly held by C & G. Schieffelin refused to accept Empire as the authorized wholesale distributor of its products, refused to ship wine to Empire, and canceled outstanding orders that were to go to C & G.

### Proceedings Before the ABC Commission

Empire, in the meantime, filed a petition for hearing, dated December 13, 1984, be-

fore the ABC Commission alleging that Schieffelin had violated the Act by not shipping wine to Empire. In a letter dated December 18, 1984, the ABC Commission notified Schieffelin that Empire had filed a petition before the commission, and, therefore, the commission could not grant Schieffelin's request to appoint Blue Ridge as its distributor because "the Act requires that the agreement [between Schieffelin and Empire] continue in effect" until the "matter is resolved by the Commission or the courts."

In a letter dated January 11, 1985, Schieffelin, in accordance with the ABC Commission's directive, agreed to ship its products to Empire. Schieffelin, however, reserved, inter alia, the right to contest Empire's right to receive wine and specifically stated that such shipments were not to be construed as constituting an "agreement" as defined in the Act, N.C.Gen.Stat. § 18B–1201(1)(a)–(f) (1983). Such shipments continue to date.

On January 17, 1985, Schieffelin filed a response to Empire's petition and asserted the following:

(1) Empire does not have standing under the Act to bring a petition before the ABC Commission for the violations alleged.

(2) The ABC Commission does not have jurisdiction to hear the matter.

(3) No "transfer of business" occurred between Empire and C & G as covered in the Act in section 18B–1206.

(4) The agreement between C & G and Schieffelin did not continue in effect pending review of the controversy.

(5) The Act is unconstitutional if applied as suggested by Empire.

(6) Empire does not meet the reasonable and material standards of Schieffelin.

(7) Empire waived any statutory rights by failing to obtain Schieffelin's consent to the alleged acquisition.

On April 1, 1985, a prehearing conference was held, and the parties engaged in extensive discovery. Thereafter, during the weeks of February 24, 1986, March 4, 1986, and May 8, 1986, very lengthy hearings were held in Charlotte, North Carolina, before a hearing officer of the ABC Commission. After the hearings, the hearing officer made findings of fact and recommended to the ABC Commission that the nonresident wine vendor permit issued to Schieffelin be revoked.

While the hearing officer's recommendation was pending before the ABC Commission, on July 24, 1986, Empire filed a civil complaint against Schieffelin in Mecklenburg County Superior Court seeking preliminary and permanent mandatory injunctions ordering Schieffelin to continue shipping wine to Empire. That action was removed to this Court on August 22, 1986 by Schieffelin pursuant to Sections 1332 and 1441 of Title 28, United States Code, and it is now pending before this Court.

On March 2, 1987, after a hearing was held before the full ABC Commission, the commission issued an final administrative decision. In a fifteen page order, the ABC Commission made seventy separate findings of fact and nine conclusions of law. The ABC Commission concluded, inter alia, that the Act was in effect for all times relevant to the proceedings, that the ABC Commission had jurisdiction, that Empire had standing under the Act by virtue of its purchase of the business of C & G to seek relief from the Commission, and that Schieffelin violated the Act by failing and refusing to continue in effect, without good cause, the agreement which arose from Empire's acquisition of C & G. The ABC Commission ordered Schieffelin's nonresident wine vendor permit suspended for a period of thirty days, beginning March 23, 1987. *ABC Commission Order*, slip op. at 13–15.

On or about March 10, 1987, Schieffelin filed a Petition for Review in Wake County Superior Court seeking a stay of the commission's order and a reversal of the commission's findings of fact and conclusions of law. *See* N.C.Gen.Stat. § 150A–43 (1983) ("Right to judicial review"); *see also Fay v. State Bd. of Alcohol Control*, 30 N.C.App. 492, 227 S.E.2d 298, *cert. denied*, 291 N.C. 175, 229 S.E.2d 689 (1976) (order of ABC Commission suspending a retail

beer permit is reviewable under § 150A–43). Schieffelin raises sixteen exceptions in its petition including, in Exception Six, an exception to the ABC Commission's conclusion that Empire has standing under the Act to raise a claim with the ABC Commission against Schieffelin. Petition at 15, *In re Schieffelin & Co. v. North Carolina Alcoholic Beverage Comm'n*, 87 CVS 1930. In addition, in Exception One, Schieffelin argues that the "Act is unconstitutional on its face and as applied in this case." *Id.* at 12. Finally, in Exception Seven, Schieffelin excepts to the ABC Commission's conclusion that the transfer of certain assets between C & G and Empire constituted a "transfer of business" as contemplated within section 18B–1206 of the Act. *Id.* at 15.

On March 18, 1987, the Wake County Superior Court entered an order enjoining Empire from enforcing the final administrative order of the ABC Commission while Schieffelin's appeal is pending in that court. On August 17, 1987, September 28, 1987, October 26, 1987, and December 10, 1987, Schieffelin obtained extensions of time in which to file its brief. The next briefing deadline is February 1, 1988. To date, that appeal is still pending.

### Proceedings in Federal Court

Since this action began in federal court, the parties have filed numerous documents and motions. This Court has denied Empire's motions for a preliminary mandatory injunction and for reference to the ABC Commission, and it has denied the parties' prior motions for summary judgment.

This Court has made several conclusions of law on state-law issues in the course of making its prior decisions. In particular, this Court has held law of the case to be that the Act *does* give a winery a right of prior consent before a wine wholesaler transfers its business. *Empire Distribs., Inc. v. Schieffelin & Co.*, 679 F.Supp. 541, 542 (W.D.N.C.1987) (order denying Empire's motion for partial summary judgement). *Contra ABC Commission Order*, slip op. at 14 (winery does not have a right of prior approval over the transfer of a wine

wholesaler's business). In addition, this Court has held that it is a question of fact whether a "transfer of business" occurred when C & G sold certain assets to Empire. *Empire Distribs., Inc. v. Schieffelin & Co.*, C–C–86–389–P, slip op. at 6 (W.D.N.C. October 15, 1986).

Now this Court has pending before it additional motions for summary judgment which have been filed by the parties. On May 6, 1987, an order was filed that continued this case in order to allow proceedings in the state system to conclude because Empire asserted that such proceedings would dispose of the action now before this Court. That has proven not to be the case, and, therefore, this Court must deal with the parties' motions which are still pending.

On August 31, 1987, this Court heard the parties' oral arguments on their motions for summary judgment, and at that time, the Court reserved judgment on the issues pending. On December 7, 1987, this Court, ex mero motu, issued an order directing the parties to file supplemental memoranda of law on the issue of abstention because the record in this case suggested to the Court that a stay of decision may be required or, at least, the most prudent course of action. On December 14, 1987, the parties complied with the Court's order and filed their supplemental memoranda of law.

### CONTENTIONS OF THE PARTIES

Empire asserts, in this Court and in the state system, that it purchased C & G's "business," as that term is contemplated in the Act in section 18B–1206, and, therefore, Schieffelin should deal with Empire in C & G's place. As evidence of that transfer, Empire notes that it purchased C & G's inventory, trademarks, trade names, customer lists, and contractual rights with suppliers. Neither C & G nor Empire ever asked for Schieffelin's prior approval on the transfer of C & G's "business." Nevertheless, Empire contends that it is now in C & G's "shoes" and is entitled to the protections of the Act.

Schieffelin alleges that Empire merely purchased C & G's inventory, contract

rights, trade marks, customer lists, and access to C & G's books and records. In addition, Empire also entered into a non-competition agreement with C & G. According to Schieffelin, Empire did not purchase the "business" of C & G since Empire did not acquire any of C & G's rolling stock, its warehouse leasehold, or C & G's goodwill.

As a threshold matter, Schieffelin seeks to have this action disposed of by arguing that Empire does not have standing in either the courts or before the ABC Commission to raise the claims now pending in this Court and the state system. In briefs filed in support of its motion for summary judgment, Schieffelin asserts that the Act was designed to regulate existing *relationships* between wineries and wine wholesalers and was not intended to protect or to give a cause of action to those seeking to purchase a wholesale wine business.

Schieffelin acknowledges that C & G, as an existing wine distributor for Schieffelin, probably had standing under the Act, under sections 18B–1206 and 18B–1207, to sue Schieffelin for unreasonably withholding consent to C & G's sale to Empire. Yet, according to Schieffelin, Empire has no standing, either in the courts or before the ABC Commission, to bring a cause of action under the Act because Empire was not a wholesaler with an existing agreement, contract, or relationship with Schieffelin.

Finally, Schieffelin argues that C & G's contract rights with Schieffelin, as modified by the Act, could not be freely assigned to Empire since such a substitution of parties would allegedly impair Schieffelin's chance of obtaining a return performance and impair the value of the original contract. Therefore, Schieffelin contends that Empire has no standing under the Act because the C & G's agreement could not have been freely assigned and no other "agreements," as defined in the Act, exist between the litigants.

In response, Empire asserts that Schieffelin only terminated C & G's distributor agreement several days after Empire had already acquired C & G's contract rights. Therefore, according to Empire

there was a contractual *agreement* between Schieffelin and Empire, C & G's successor, at the time Schieffelin attempted to terminate the purported relationship. In support of this conclusion, Empire asserts that the Act's intended purpose is to protect all wine wholesalerships. Thus, according to Empire, the Act should be liberally construed so as to permit plaintiffs, such as Empire, to raise claims of the sort Empire is now pursuing in this Court and in the state system.

On a more substantive level, Schieffelin argues that the Act is unconstitutional under the United States Constitution because it violates both the due process clause, U.S. Const. amends. V & XIV, § 1, and the contracts clause, U.S. Const. art. I, § 10, cl. 1. In particular, Schieffelin argues that if the Act is construed to apply retroactively to C & G's written contract, such a retroactive application violates the contracts clause of the United States Constitution. In addition, Schieffelin contends that the Act is also unconstitutional under the North Carolina Constitution. *See* N.C. Const. art. I, §§ 19, 32, 34.

Schieffelin also contends that this action should not be stayed while its petition to review the administrative decision of the ABC Commission is pending in the Wake County Superior Court. Schieffelin asserts that a temporary stay of this case is not warranted under accepted doctrines of abstention used in the federal system. In addition, Schieffelin contends that the issues pending in the state system are substantially different from the issues pending in this Court. Finally, Schieffelin argues that a stay of this case is inequitable since .Schieffelin has not proceeded with preparing for the administrative review pending in Wake County Superior Court. Schieffelin contends that it was expecting a dispositive decision on the issues pending before the Court, and, therefore, it is unwilling to endure the delay necessarily entailed by a stay of this action.

Empire, as might be expected, supports a stay of the present case until a final decision is reached in the state system on Schieffelin's administrative appeal. Al-

though Empire is not party to the action judicially reviewing the administrative order of the ABC Commission, Empire is willing to wait for a state court decision since Empire will benefit indirectly by receiving wine from Schieffelin in the interim.

## ANALYSIS OF THE APPLICABLE LAW

Since this action arises under this Court's diversity jurisdiction, 28 U.S.C. § 1332 (1982), this Court must apply the substantive law of the state in which it is situated to the non-federal and non-constitutional questions. 28 U.S.C.A. § 1652 (West 1966 & Supp.1987) ("Rules Decision Act"); see also *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In this case the substantive state law has its origin in the Act. Therefore, some discussion of the provisions of the Act is necessary.

### *The Wine Distribution Agreements Act*

The Act is a fairly new statute. Research has revealed only one published state court judicial opinion that construes any part of the Act. *Empire Distribs., Inc. v. North Carolina Alcohol Beverage Control Comm'n*, 85 N.C.App. 528, 355 S.E.2d 524 (1987) (ABC Commission has subject matter jurisdiction to hear contract dispute between distributor and supplier). The Wine Distribution Agreements Act explicitly states that the underlying purposes and policies of the Act are:

(1) To promote the compelling interest of the public in fair business *relations* between wine wholesalers and wineries, and in the *continuation* of wine wholesalerships on a fair basis;

(2) To protect wine wholesalers against unfair treatment by wineries;

(3) To provide wine wholesalers with rights and remedies in addition to those existing by contract or common law; and

(4) To govern all wine wholesalerships, including any renewals or amendments, to the full extent consistent with the Constitution of this State and the United States.

N.C.Gen.Stat. § 18B–1200(b)(1)–(4) (1983) (emphasis added). The Act is to be liberally construed in order to effectuate the intended policies of the Act. *Id.* § 18B–1200(a).

The Act defines an "agreement" as a commercial relationship between a wine wholesaler and a winery, N.C.Gen.Stat. § 18B–1201(1) (1983), and it gives various examples of prima facie evidence of an agreement. *Id.* § 18B–1201(1)(a)–(f). Agreements under the Act do not have to be in writing. *Id.* § 18B–1201(1). The Act provides, in pertinent part, the following:

Notwithstanding the terms, provisions, or conditions of any agreement, no winery may amend, cancel, terminate or refuse to continue to renew any agreement, or cause a wholesaler to resign from an agreement, unless good cause exists for amendment, termination, cancellation, nonrenewal, noncontinuation, or resignation.

. . . .

. . . . The burden of proving good cause for amendment, termination, cancellation, nonrenewal, noncontinuation, or resignation is on the winery.

*Id.* § 18B–1204. The Act lists certain events that constitute "good cause," including:

(1) Revocation of the wholesalers's permit or license to do business in [North Carolina];

(2) Bankruptcy or receivership of the wholesaler;

(3) Assignment for the benefit of creditors or similar disposition of the assets of the wholesaler; or

(4) Failure of the wholesaler to comply substantially, without reasonable excuse or justification, with any reasonable and material requirement imposed upon him by the winery. . . .

*Id.*

If a winery desires to amend, terminate, cancel, or not renew any agreement, the winery generally must notify the wholesaler and the ABC Commission of its intent to do so, unless the reason for such action is

that the wholesaler has gone into bankruptcy or receivership, had its permit or license revoked, or assigned its assets for the benefit of creditors. *Id.* § 18B–1205. The Act gives wholesalers an opportunity to rectify any problems raised by a winery seeking to terminate an agreement, and either the winery or the wholesaler can seek review in a hearing before the ABC Commission on matters concerning amendments, terminations, cancellations, and non-renewals. *Id.; see also Empire Distribs., Inc. v. North Carolina ABC Comm'n,* 85 N.C.App. 528, 355 S.E.2d 524 (1987) (ABC Commission has subject matter jurisdiction over contract dispute between distributor and supplier).

Finally, for the purpose of the present motions it should be noted that the Act prohibits a winery from unreasonably withholding or delaying its consent "to any transfer of the wholesaler's business or transfer of the stock or other interest in the wholesalership whenever the wholesaler to be substituted must meet the material and reasonable qualifications and standards required of the winery's wholesalers." N.C.Gen.Stat. § 18B–1206(a) (1983). This Court has held that a winery has a right of prior approval over a wholesaler's transfer of business under this section. *Empire Distribs., Inc. v. Schieffelin & Co.,* 679 F.Supp. 541, 542 (W.D.N.C.1987) (Potter, Ch. J.) ("winery does have a right of prior consent" under the Act). *Contra ABC Commission Order,* slip op. at 14 (winery does not have a right of prior approval over the transfer of a wine wholesaler's business with which the winery has an agreement covered by the Act).

If a winery violates the Act, a wholesaler may sue the winery in court. *Id.* § 1207(a). "The court may grant injunctive and other appropriate relief, including damages to compensate the wholesaler for the value of the agreement and any good will, to remedy violations" of the Act. *Id.* Research has not revealed any state court decisions construing this section on judicial remedies. This section of the Act, however, has been construed by one federal district court so as to allow a transferee of a wholesaler to

maintain a suit against a winery that refused to deal with the transferee. *Collins Wholesale Distrib. Co. v. E. & J. Gallo Winery,* — F.Supp. —, C–C–86–475–M, slip op. at 4 (W.D.N.C. May 20, 1987) (McMillan, J.) (section 18B–1206, "governing the transfer of businesses, protects the transferor wholesaler as well as *'the wholesaler to be substituted.'* ") (emphasis in the original).

### Abstention

From the record in this case it is apparent that there are pending state court proceedings involving Schieffelin, the Act, and unsettled state-law issues. Proper concern for federal-state relations and jurisprudential restraint counsel that abstention may be the appropriate course of action. This Court, sua sponte, has raised the issue of abstention, and, therefore, a brief discussion on the subject is appropriate before other matters are considered.

At the outset, it should be noted that "the judge-made doctrine of abstention is applicable only in special circumstances." *Wohl v. Keene,* 476 F.2d 171, 174 (4th Cir.1973) (citing *AFA Distrib. Co. v. Pearl Brewing Co.,* 470 F.2d 1210, 1213 (4th Cir. 1973)). Yet, there are five categories of cases in which abstention, either by dismissal or stay, is the appropriate course of action. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813–818, 96 S.Ct. 1236, 1244–46, 47 L.Ed.2d 483 (1976) (setting out four types of abstention). *See generally* 17 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* §§ 4241–48 (1978 & Supp.1987) (in § 4246 cases are collected in which federal courts abstained in order to allow pending state proceedings to decide unsettled questions of state law). Since the facts and circumstances surrounding this action implicate, at least partially, four of the five categories of cases, all five classes will be briefly described.

■ First, *Pullman*-type "[a]bsention is appropriate 'in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a

state court determination of pertinent state law.'" *Colorado River Water Conservation Dist. v. United States*, 424 U.S. at 814, 96 S.Ct. at 1244 (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 186, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959)); *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (first abstention case of this type which lends its name to the category); *Wohl v. Keene*, 476 F.2d 171 (4th Cir.1973). Second, *Burford*-type "[a]bstention is ... appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. at 814, 96 S.Ct. at 1244 (citing *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959)). Third, *Younger*-type "abstention is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings." *Id.* at 816, 96 S.Ct. at 1245. This type of abstention is not implicated by the facts of the present case. Fourth, even when prudential considerations of state-federal comity or of judicial restraint are not involved, *Colorado River*-type abstention is appropriate in some exceptional circumstances in order to avoid piece-meal or duplicative litigation which may unnecessarily consume scarce judicial resources. *Id.* at 817–818, 96 S.Ct. at 1246; *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 15–16, 103 S.Ct. 927, 936–37, 74 L.Ed.2d 765 (1983) (a court considering abstention must balance the important factors mentioned in *Colorado River*, but the balance is heavily weighted in favor of the exercise of jurisdiction). Fifth, when a state court proceeding is pending "there is no problem if the federal court merely postpones decision for a time to await an opinion of the state court." 17 C. Wright, A. Miller, & E.

Cooper, *Federal Practice and Procedure* § 4246 (1978 & Supp.1987); *Nature Conservancy v. Machipongo Club, Inc.* 579 F.2d 873 (4th Cir.), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978).

Courts have applied these doctrines in various ways to justify abstention. In *AFA Distributing Co. v. Pearl Brewing Co.*, 470 F.2d 1210 (4th Cir.1973), the United States Court of Appeals for the Fourth Circuit held that abstention was proper when a state statute regulating franchises to distribute wine and beer was the focus of a dispute between two private parties. *Id.* at 1213. *But see Vintage Imports, Ltd. v. Joseph E. Seagram & Sons, Inc.*, 409 F.Supp. 497 (E.D.Va.1976) (holding that case did not have special circumstances requiring abstention and that broad power of states to regulate alcohol distribution did not, in itself, mandate abstention). *Pearl Brewing* is an important Fourth Circuit case dealing with abstention doctrines as they relate to state alcohol regulations, and, therefore, it will be discussed in some detail.

In *Pearl Brewing*, a local Virginia beer distributing company tried to prevent a Texas manufacturer of beer from terminating an exclusive franchise agreement relating to the distribution of a particular brand of malt liquor in Virginia. *Id.* at 1211. The local beer company filed a complaint in federal district court in Virginia, and jurisdiction existed by reason of diversity of citizenship, 28 U.S.C. § 1332. *AFA Distrib. Co. v. Pearl Brewing Co.*, 470 F.2d at 1211. A then newly enacted Virginia statute, Va.Code Ann. § 4–80.2, restricted the ability of a beer manufacturer to terminate without cause a distribution franchise. The district court in *Pearl Brewing* construed the statute as applying only prospectively to contracts entered into after a certain date. *Id.* at 1212. Since the contract between the parties in *Pearl Brewing* was entered into *before* that date, the district court dismissed the complaint of the local beer distributor. *Id.*

The court of appeals in *Pearl Brewing*, however, thought that the Virginia statute was "exceedingly difficult and incredibly

ambiguous." *Id.* at 1211. The Fourth Circuit suggested an alternative construction of the relevant portions of the Virginia statute. The appeal court's alternative reading made the statute retroactively applicable to the contract of the local beer distributor which, in turn, made dismissal of the complaint improper. *Id.* at 1212. Yet, if the statute was retroactive, a constitutional question would necessarily be implicated: The contracts clause. The Fourth Circuit held that *Pullman*-type abstention was thus appropriate since the statute was ambiguous and involved unsettled issues of state law which could be decided in such a way as to make it unnecessary for the federal courts to reach the constitutional issue. *Id.*

■ In *Pearl Brewing*, the court of appeals reasoned that abstention was proper but not merely because the state law was difficult. *Id.* When faced with difficult state-law issues, the federal courts ordinarily have an obligation to decide the state-law issues and not to abstain. *Id.* at 1213 (citing *Meredith v. Winter Haven*, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943)). Yet when there are special circumstances, the judge-made doctrine of abstention is appropriate. *Id.* (citing *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)).

■ In *Pearl Brewing*, the court of appeals found such special circumstances justifying abstention. *Id.* First, the court noted that the state law was unclear and that a state court decision could conceivably avoid a constitutional decision. *Id.* (citing *Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970)); *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Second, since the local beer distributor, a Virginia citizen, was the party to invoke federal jurisdiction, there was no reason for it to fear the decisions of the state court. *AFA Distrib. Co. v. Pearl Brewing Co.*, 470 F.2d at 1213 (" 'little basis in fact for xenophobia—no reason to fear a provincial locally oriented' court"). Third, the *Pearl Brewing* court of appeals held that the states have exclusive dominion over the control of distribution and sale of alcoholic beverages, and, therefore, "[p]eripheral and episodic federal court interpretations of state statutory schemes of control are not desirable and could be harmful." *Id.* at 1214.

Since *Pearl Brewing* was decided, several courts have considered the three part "special circumstances" test laid out in that decision. *E.g., Educational Servs. v. Maryland State Board for Higher Educ.* 710 F.2d 170 (4th Cir.1983) ("All of the elements converging in *Pearl Brewing* to prompt dismissal are in reality the opposite of those present here"); *Brown–Forman Corp. v. South Carolina Alcoholic Beverage Control Comm'n*, 643 F.Supp. 943 (D.S.C.1986) (court not required to abstain from deciding constitutional issue when state statute regulating sale of alcoholic beverages was not ambiguous and challenger was not a local entity); *Vintage Imports, Ltd. v. Joseph E. Seagram & Sons, Inc.*, 409 F.Supp. 497 (E.D.Va.1976). Today *Pearl Brewing* appears to be good authority to use on any cases that come within its special circumstances.

It does not appear that a temporary stay of the present case is necessary under either *Pearl Brewing* or the abstention jurisprudence of the United States Supreme Court. The present case does not come within the three part special circumstances test laid down in *Pearl Brewing* and does not clearly come within the any of the five categories of abstention doctrine noted above. First, there are dispositive issues before the Court which do not have a constitutional dimension which must be decided before any other issues: For example, the issue of standing. If the Court decided those issues in such a way as to dispose of the case, the Court would not have to reach the questions that would implicate the analysis described in *Pearl Brewing*. Second, even if the Court were to reach those constitutional issues, the provisions of the Act that implicate constitutional issues are unambiguous. For example, in *Empire Distributors of the Carolinas, Inc. v. Heublein Wines*, No. 84–160–CIV–5 (E.D.N.C. May 1, 1985), District Judge Britt stated:

It is clear from the Act's provisions that the North Carolina General Assembly intended for the Act to be applied retroactively. For example, N.C.Gen.Stat. § 18B–1200 provides that the Act shall be liberally construed to "govern all wine wholesalerships, including any renewals or amendments, to the full extent consistent with the Constitution of this state and the the United States." *See* N.C. Gen.Stat. § 18B–1200 (1983). Thus, the Act is to be applied retroactively to the extent that it is constitutionally permissible to do so.

*Empire Distribs., Inc. v. Heublein Wines,* No. 84–160–CIV–5, slip op. at 5. Although the Wake County Superior Court will be deciding whether the Act was intended to apply retroactively, *Pullman*-type abstention is not justified and a stay of this case should not be ordered because the Act itself is not unclear. *See AFA Distrib. Co. v. Pearl Brewing Co.,* 470 F.2d at 1213 ("Since ... the state law is unclear and a state court decision could conceivably avoid a constitutional decision, abstention is appropriate.")

Third, although the present case involves an area of law that is important to the state of North Carolina and its citizenry, the dispute in this forum is only between two private parties. The Act states that it is intended "to promote the compelling interest of the public in fair business relations between wine wholesalers and wineries and in the continuation of wine wholesalerships on a fair basis" and "to protect wine wholesalers against unfair treatment by wineries." N.C.Gen.Stat. § 18B–1200(b)(1)–(2) (1983). That intention, however, does not by itself create the sort of overwhelming state interest that would require abstention. *Vintage Imports, Ltd. v. Joseph E. Seagram & Sons, Inc.,* 409 F.Supp. 497 (E.D.Va.1976) (holding that broad power of states to regulate alcohol distribution did not, in itself, mandate abstention).

Fourth, the present case differs in a very important respect from *Pearl Brewing.* In *Pearl Brewing,* the corporate plaintiff that invoked federal jurisdiction was a citizen of the state of Virginia. If the district court abstained from deciding issues of Virginia law, the corporate plaintiff would not have to fear " 'a provincial locally oriented' court." *Id.* As the *Pearl Brewing* court stated:

> [W]hen a person's involvement with a state is such as to eliminate any real risk of prejudice against him as a stranger and to make it unreasonable to heed any objection he might have to the quality of its judicial system, he should not be permitted to choose a federal forum, but should be required to litigate in the courts of the state.

*Id.* at 1213–14 (quoting ALI, *Study of the Division of Jurisdiction between State and Federal Courts* 2 (1969 Official Draft)). In the present case Schieffelin, a Delaware corporation, is "a stranger" to North Carolina. Schieffelin understandably fears the interpretations of law which may be rendered by the North Carolina courts. It was Schieffelin that chose to have the present case litigated in federal court, and it should not be forced to wait an unreasonable period of time for the state court's determinations on issues that are properly before the district court.

Finally, it should be noted that a stay of the present case will not aid in the swift resolution of the dispute between the parties. It will be many months before the Wake County Superior Court enters a decision on the issues that are pending before it now. Schieffelin's appeal in the state system certainly raises many of the same issues that are before the Court, but an authoritative state court decision on those issues is not likely to be forthcoming in the near future. In addition, even if Schieffelin's appeal is decided, there will be some legal issues the Court will have to decide on its own simply because the same issues are not pending in the state system, such as the issue of standing to sue under Section 18B–1207 of the Act. Although the Court is reluctant to enter a decision which may conflict with the state courts' interpretation of the Act, it appears that the issues are properly before the Court and that a stay cannot be reasonably justified.

Thus, the present case does not fall within the three part test laid down in *Pearl Brewing.* In addition, none of the other traditional types of abstention are applicable to this case.

### Standing

■ Section 18B–1207, as mentioned previously, is the portion of the Act which provides for judicial remedies, and it states that "[i]f a winery violates any provision of [the Act], *a wholesaler* may maintain a suit against the winery." N.C.Gen.Stat. § 18B–1207 (1983) (emphasis added). Empire holds a North Carolina permit for the wholesale distribution of wine and beer, *ABC Commission Order,* slip op. at 1, and it is a wine wholesaler within the meaning of the Act, N.C.Gen.Stat. § 18B–1201(3) (1983). One issue raised by Schieffelin that is pending before the Court is whether the North Carolina legislature intended to give standing under the Act to a wholesaler, such as Empire, who is seeking to purchase the business of a wine wholesaler who is in a relationship covered and protected by the Act. The Court is of the opinion that the Act does not give standing to the wholesaler who is seeking to buy the original wine wholesaler's business. *Contra Collins Wholesale Distrib. Co. v. E. & J. Gallo Winery,* 678 F.Supp. 593, 595 (W.D.N.C. 1987) (McMillan, J.) (Section 18B–1206, "governing the transfer of businesses, protects the transferor wholesaler as well as *'the wholesaler to be substituted.'* ") (emphasis in the original).

In *Collins Wholesale Distributing Co. v. E. & J. Gallo Winery,* 678 F.Supp. 593 (W.D.N.C.1987), Judge McMillan held that a prospective purchaser of a wine wholesalership was entitled to sue under Section 18B–1207 of the Act because the purchaser could be considered "a wholesaler." Gallo, the defendant winery, had argued to the court that the prospective purchaser, Collins, was not a wholesaler because it did not have a wine wholesaler permit which would bring it with- in the definition of wholesaler that appears in the Act. The *Collins* court dismissed Gallo's arguments by reasoning that the purposes of the Act require that

the prospective purchaser be considered a wholesaler with standing to pursue judicial remedies. The court went on to state:

> To construe the term "wholesaler" as the defendant suggests would include within the scope of "wholesaler to be substituted," a wholesaler who already had a franchise, but would exclude a wholesaler who wished to enter the business but had not yet obtained a permit. Such a construction would be contrary to the legislative intent to "govern *all* wine wholesalerships" (emphasis added).
>
> Such a limiting construction also would nullify the provisions of the statute which require wineries to "make reasonable efforts to *establish* agreements with wholesalers who are females and members of minority groups." [N.C.Gen. Stat. § 1202(4) (1983) ] (emphasis added). A minority or female "wholesaler" seeking to establish a franchise may not yet have a wine wholesaler permit, and under the interpretation of the defendant, would have no standing under the act to sue a winery which discriminated against her.

*Collins,* 678 F.Supp. at 595 (emphasis in the original). The issue in the present case is not whether Empire is a wholesaler. Rather, the issue is whether a wholesaler who does not have any prior relationship with a winery can sue that winery under the Act when the winery refuses to accept that wholesaler as the transferee of the business of a wine wholesaler who did have an existing relationship with the winery. *Collins* fails to take into account the purposes behind Section 1206 of the Act, which governs transfers of wine wholesalerships, and the winery's right of prior consent embodied within that section.

The language of the Act does not reveal an unambiguous intention of the North Carolina legislature to give to prospective transferees of wine wholesalerships standing to sue a winery when such winery withholds its consent to a transfer of business contemplated under Section 18B–1206(a) of the Act. Instead, the Act merely states that "a wholesaler" may maintain a suit against a winery if the winery violates

the Act. Although the Act is to be liberally construed and applied to promote its underlying purposes and policies, *see* N.C. Gen.Stat. 18B–1200 (1983), the underlying purposes of the Act will not necessarily be furthered by construing the Act in such a way as to give a proposed purchaser of a wholesaler's business standing to seek the Act's protections.

The Act's language and its underlying purposes define the appropriate class of entities that are to be afforded the protections of the Act. One of the Act's purposes is to promote fair business relations between wine wholesalers and wineries. *Id.* § 18B–1200(1). The clear language of the Act discloses an intention to govern (1) relations that were existing at the time of the effective date of the Act and (2) relations contemplated and entered into by parties since that time. There is only one mention of potential relationships: Section 18B–1215 states that "[i]t is the intention of [the Act] that there shall be no unlawful discrimination based on race, color, creed, sex, religion, or national origin in any aspect of the awarding or maintaining of agreements covered by" the Act. *Id.* § 18B–1215. That section, however, is not implicated in any way by the facts of the present case.

The provisions of the Act relating to judicial remedies clearly implicate only existing relationships. For example, Section 18B–1207(a) of the Act states that "[t]he court may grant other appropriate relief, *including damages to compensate the wholesaler for the value of the agreement and any good will*, to remedy violations of [the Act]." *Id.* § 18B–1207(a) (emphasis added). Further, Section 18B–1207(b) states that "[a]ny winery that amends, cancels, terminates, or refuses to renew any wine agreement, or causes a wholesaler to resign from an agreement shall compensate the wine wholesaler for the wine wholesaler's wine inventory." *Id.* § 18B–1207(b). These remedy provisions by their terms seem to have been drafted with the intent to protect only wholesalers with existing relationships with wineries and not prospective purchasers of wine wholesale businesses.

Prior to the time that Empire sought to purchase certain assets of C & G, Empire did not have a relationship with Schieffelin; only C & G did. Now Empire is seeking to assert that it has a relationship with Schieffelin by virtue of its purchase of certain assets of C & G. Empire contends that it is now in C & G's shoes because it purchased the "business." Therefore, Empire argues, there is a relationship between Schieffelin and Empire: It is the same relationship C & G had with Schieffelin; only the parties are different.

Empire's first argument is without merit because it fails to take into account the winery's right of prior approval, which is embodied in Section 18B–1206(a). One obvious purpose of Section 18B–1206 is to allow wine wholesalers to sell their businesses. For various reasons wholesalers may decide to leave the wine wholesale business: To retire, to change businesses, to liquidate assets. The value of a wine wholesaler's business is directly related to the quantity and quality of the relationships that the wholesaler has with various wineries and wine importers. If a wine wholesaler has a large number of attractive product lines to offer to its customers, who are supermarkets and speciality stores, then the customers are more likely to order their wine from that particular wholesaler. On the other hand, a wine wholesaler that does not have significant valuable relationships with wineries does not have much in the way of a business. Thus, a substantial portion of that business's value is dependent on the wine distribution agreements that the wholesaler has to offer. Potential purchasers of wine wholesalerships, of course, know this.

The Act, in Section 18B–1206, recognizes that the value of a wine wholesale business at sale time lies in its wine distribution agreements. Without the agreements, the wine wholesalership is an entity with reduced and limited value. The Act provides a protective mechanism which allows wholesalers to sell their businesses along with their existing relationships with wineries. If a wholesaler desires to transfer its business and be protected by the Act, then

he should inform the wineries that have agreements with him of his intention to sell. The wineries would then be able to consent or withhold their consent to the transfer. Such consent, however, could not be unreasonably withheld. *Id.* § 18B–1206.

Since a winery has a right of prior approval over a transfer of business under Section 18B–1206 of the Act, *Empire Distribs., Inc. v. Schieffelin & Co.*, 679 F.Supp. 541, 542 (W.D.N.C.1987), it follows that if a winery does not give such approval, the wholesaler with the existing relationship, and not the proposed transferor, is the proper party to bring a suit to challenge the winery's refusal. The purpose of Section 18B–1206 would be efficiently and best effectuated by only allowing the party that was intended to be protected, the original wholesaler, to pursue its judicial remedies. Patently unfair results would flow from any different conclusion.

If this Court were to hold that the proposed transferee has standing to object to a winery's refusal to give consent to a transfer of a wholesaler's business, then the right of prior consent would be of extremely limited value. The wine wholesaler and his prospective purchaser could simply consummate the deal without consulting with the wineries and then present the world with a virtual *fait accompli.* The wineries would be faced with only two choices: To accept or to reject the substituted wholesaler. If the wholesaler to be substituted met the reasonable standards of the winery, then, of course, the winery would be likely to accept readily the new wholesaler. Rejection of the substituted wholesaler, however, would not be an easy course to pursue because the wholesaler to be substituted would have standing to sue the winery. The whole issue of consent would be changed from one that was intended to be negotiated between the original wholesaler and the winery to one that would have to be litigated between strangers. With the damoclean sword of litigation hanging over their heads, few wineries would choose to reject a substituted whole-

saler unless such wholesaler was demonstrably and obviously inferior.

It seems much more likely that the North Carolina legislature intended to give some protections to the wineries in the Act. For the most part the Act one-sidedly protects wine wholesalers, but the implicit right of prior consent embodied in Section 18B–1206 gives to the wineries the right to enter into new business relationships with wholesalers to be substituted who meet the reasonable standards of the wineries. In short, the right of prior consent provides a measure of control. Such limited protection afforded to the wineries would be significantly undermined if the wholesaler to be substituted could buy the wholesale business without consulting with the winery and then sue to force the winery to accept a wholesaler that the winery finds objectionable. Given the purpose of Section 18B–1206 it seems that the original wholesaler is in a much better position to negotiate the issue of consent and to litigate that issue if the winery unreasonably withholds such consent. In negotiations, the parties could work towards finding a mutually suitable purchaser. If such negotiations were not successful, the original wholesaler would be able present in the proper forum policy arguments supporting a determination that the winery should accept the proposed purchaser of the wine wholesalership. During the course of either negotiations or litigation the wine distribution agreement between the parties would continue without significant disruption: The parties were in a working relationship before the proposed sale was announced, and the continuation of that relationship would not work a substantial hardship on either party. During the potentially lengthy period involved in negotiations or litigation the winery would not have to ship wine to a wine wholesaler it finds objectionable.

In the present case C & G and Empire consummated their transactions before they informed Schieffelin. Schieffelin attempted to act quickly in order to prevent the creation of a new relationship with Empire. Instead, Schieffelin has been forced for a substantial period of time to litigate against, and do business with, an

entity that is objectionable to Schieffelin. It is possible that Schieffelin's objections to Empire are unreasonable and unfounded. It seems patently unfair, however, to force Schieffelin to defend a suit that may have been avoided altogether. If C & G had asked for Schieffelin's prior consent before C & G sold its assets to Empire, Schieffelin would have been able to give its opinion on Empire. If Schieffelin objected then, C & G and Schieffelin might have been able to pursue another purchaser, or C & G could have sought a judicial remedy under Section 18B–1207. Clearly C & G would have had standing to raise the issue, and the issue in such a case brought by C & G would have been narrowly drawn: Is Schieffelin unreasonably withholding its consent to the transfer of C & G's business? By contrast, a multitude of issues have arisen from Empire's suit against Schieffelin.

The parties have been joined, against Schieffelin's will, in a relationship that can be described best as unholy wedlock, and the extraordinary amount of time and energy that has been expended thus far in this lawsuit is convincing testimony to the effect that Empire, as an unwanted suitor, is not the proper party to contest its own desirability. C & G, the predecessor, should not have fled the scene after foisting Empire on Schieffelin. If C & G was so anxious to sell its business to Empire, then it should have approached Schieffelin, and if Schieffelin was unwilling to consent, C & G should have been the one to fight the battle.

### CONCLUSION

In summary, it does not appear from the language and the underlying purposes of the Act that the North Carolina legislature intended to give standing to proposed transferees of wine wholesalerships who are seeking the protections of the Act in the courts. When a winery withholds its consent to a proposed transfer of business under Section 18B–1206 then the proper procedure is for the wine wholesaler who has the existing agreement with the winery to seek the protections of the Act. The original wine wholesaler clearly has standing under the Act to seek a judicial remedy, and the Court cannot see how the purposes of the Act would be effectively, fairly, and orderly pursued by allowing a proposed purchaser of the wholesale business, who is a stranger to the winery, to seek the assistance of the courts.

Therefore, Schieffelin's motion for summary judgment will be granted because Empire does not have standing under the North Carolina Wine Distribution Agreements Act to seek a judicial remedy. A Judgment for Schieffelin shall be entered simultaneously with this Memorandum of Decision.

### JUDGMENT

In accordance with the Memorandum of Decision filed simultaneously herewith, Summary Judgment will be entered in favor of Defendant.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED that Judgment for Schieffelin & Co. be entered in the above-entitled action; each party will pay its own costs.